[No. G046687. Fourth Dist., Div. Three. Dec. 31, 2012.]

In re the Marriage of E.U. and J.E.
E.U., Appellant, v.
J.E., Respondent.

COUNSEL

Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Appellant.

Baron & Legal and Brian W. Baron for Respondent.

OPINION

IKOLA, J.—Family Code section 3047 is intended to protect the parental rights of deployed servicemembers and to promote the expeditious resolution of custody disputes in deployment situations.[1] The statute establishes a presumption that a servicemember returning from military service should regain his or her predeployment custody of a child, unless the court determines it is not in the child's best interests.

The case before us illustrates the challenges faced by military parents upon their return home from serving their country. After protracted legal proceedings, the court ruled that E.U. (father) should lose primary care of his child due to father's temporary deployment to Afghanistan, during which the child's mother assumed primary custody. We hold the court erred by failing to enforce a court order which provided that father's custody should be reinstated upon his return from military service, and by failing to provide the "fair, efficient, and expeditious process to resolve [the] child custody and visitation issue[]" intended by the Legislature when it enacted section 3047. (*Id.*, subd. (h).)

FACTS[2]

*2000 to 2009: First Nine Years of Minor's Life*

In 2000, S.U. (minor) was born to father and J.E. (mother). A year later, the parents divorced.

The parents shared joint custody of minor under a court order which provided that (1) minor would attend the Oceanside school near father's

---

[1] All statutory references are to the Family Code unless otherwise stated.

[2] We granted father's request to take judicial notice of the record in his prior writ proceeding (*E.U. v. Superior Court* (Aug. 25, 2011, G045667) [petn. den. by order]). Accordingly, some of the facts recited in this opinion are taken from that record.

Mother's respondent's brief lacks page citations to the record. Accordingly, we do not augment or vary our factual recitation in this opinion by including any of mother's unsupported factual assertions. (Cal. Rules of Court, rule 8.204(a)(1)(C) [Each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."].)

home and (2) father would have primary physical custody of minor. The court issued this custody order in October 2005, then formalized it in a written order in July 2006, and subsequently reaffirmed it in 2007 after ruling the parenting arrangement was in minor's best interests. In this opinion, we shall refer collectively to these three custody orders as the "2006 custody order." Pursuant to the 2006 custody order, minor attended the Oceanside school for four years, from August 2005 to September 2009.

The 2006 custody order anticipated that father or mother might at some time be called to active military duty. Paragraph 11 of that five-page order provided: "If military deployment should require either parent to leave California, the parent remaining in California should assume the role of primary parent, with a return to the established parenting plan upon the return of the [deployed] parent to California."[3] In this opinion, we shall refer to this clause as the "reinstatement directive."

*July 2009 to August 2010: Father's Deployment to Afghanistan*

In July 2009, father was activated for military duty in Afghanistan. The orders contemplated father being (1) quartered at Camp Pendleton, California, from August 2, 2009, through November 2, 2009, (2) in Afghanistan from November 3, 2009, through July 15, 2010, and (3) at Camp Pendleton from July 16, 2010, through August 21, 2010.

On August 7, 2009, father filed an order to show cause (OSC), seeking to enroll minor at a school located midway between father's and mother's homes. On August 14, 2009, the court ordered that minor should remain in the Oceanside school near father's home.

Meanwhile, on August 13, 2009, mother filed an OSC, which is not in the appellate record, but which is later described by the judge as a request for attorney fees and sanctions. Apparently, mother's OSC was set for hearing on September 28, 2009, because on or about August 27, 2009, father served the court and mother with (1) an application for a stay of proceedings under the Servicemembers Civil Relief Act (50 U.S.C. Appen. § 501 et seq.), advising them that his "current military duties require[d him] to be present for unit training on" September 28, 2009, and that the next date he could be in family court was almost a year later on July 30, 2010, and (2) a letter from father's commanding officer, stating that father's military duties prevented him from attending a court hearing on September 28, 2009.[4]

---

[3] According to father, mother previously served in the military.

[4] The Servicemembers Civil Relief Act (50 U.S.C. Appen. § 501 et seq.) "provide[s] for the temporary suspension of judicial . . . proceedings . . . that may adversely affect the civil rights of servicemembers during their military service." (*Id.*, § 502(2).) Under 50 United States Code

It also appears mother signed another application for an OSC on September 9, 2009, which was eventually filed with the court as an ex parte application on September 15, 2009. Mother's OSC sought sole legal and physical custody of minor and a temporary order that minor be enrolled in a school near mother's home. (On appeal, mother has augmented the record with a copy of this OSC, but without the supporting declaration. It is unclear whether mother offered any legal argument or supporting evidence as to minor's best interests, or whether her OSC was simply in response to father's deployment.)

Mother apparently gave prior notice to father that she intended to appear in court with her ex parte application on September 15, 2009, because father sent a second application for stay of the proceedings under the Servicemembers Civil Relief Act. This application was dated September 10, 2009, and the proof of service shows delivery to the court on September 14, 2009. Father's commanding officer also wrote two additional letters, one dated September 10, 2009, stating that father's military duties prevented his appearance in court for a hearing scheduled on September 15, 2009, and another dated September 18, 2009, stating that father's military duties prevented his appearance in court on September 24, 2009. Both letters stated that "military leave is not authorized for [father] at the time of this letter."

On September 24, 2009, in father's absence, and apparently without recognizing that the existing 2006 custody order already provided for the eventuality of father's military deployment, Judge Nancy A. Pollard found father was deployed and issued a temporary custody order, stating: "Because of the immediacy and the necessity to have a parent available to sign any documentation necessary should there be an emergency for this child, [the court is] going to temporarily order, without prejudice to father, that mother is to have the sole legal and sole physical custody of the minor child and that that child will be enrolled in the school of mother's choice." The court stated the order would "remain in effect until [father] returns from his deployment . . . . At that time he may file an order to show cause to modify the custody . . . ."

In October 2009, father filed a motion to vacate all orders made after August 27, 2009, and to stay the matter until he returned on July 20, 2010, from military deployment. Father declared (1) the 2006 custody order mandated reversion to the established parenting plan upon the return of the

Appendix section 521, in a child custody proceeding in which the defendant is in military service, the court must grant a stay of proceedings if "there may be a defense to the action and a defense cannot be presented without the presence of the defendant . . . ." (*Id.*, § 521(a), (d)(1).) The documents submitted by father in August 2009 appear to meet the requirements for a stay of judicial proceedings. (*Id.*, § 522(b)(2).)

deployed parent to California, (2) father was deployed, had applied for a stay of proceedings under the Servicemembers Civil Relief Act on August 27, 2009, and had provided the court and mother with copies of the necessary letters and notices, and (3) mother had attached copies of those letters to her September 15, 2009 ex parte OSC. Although the appellate record is silent on the outcome of this motion, obviously father received no relief relevant to this appeal.

On August 23, 2010, father was released from active duty.

*October 2010 to February 2012: Court Proceedings*

We summarize below the protracted legal proceedings which extended over a period of 17 months after father's return home. During this period, mother continued to have primary physical custody of minor due to the court's refusal to reinstate the predeployment custody arrangement pursuant to the reinstatement directive of the 2006 custody order, and mother's failure to comply voluntarily with the reinstatement directive.

### (1) *October 2010: Father Appears in Court*

On August 3, 2010, shortly before father's release from active duty, mother filed a declaration in support of a motion to disqualify the judge, and, on the next day, the case was reassigned to another judicial officer, apparently a commissioner.[5] On September 17, the case was once again reassigned to a different judicial officer, this time Judge Michael S. McCartin. In a later hearing, father explained that the case had been reassigned again because he had not agreed to a commissioner.

On October 1, 2010, two weeks after the case had been assigned to Judge McCartin, father appeared in propria persona before Judge McCartin. The record does not reflect the reason for the appearance or the nature of the matter on calendar that day. Father later recalled that he had "mentioned" his belief that "we were reverting everything back on that day," and Judge McCartin later recalled encouraging father to file for a custody "modification." Judge McCartin continued the matter.

### (2) *January to February 2011: Father Deployed to Korea*

From mid-January to mid-February of 2011, father was again mobilized, this time to Korea. But as of February 11, 2011, father was "no longer on active duty" and was "in the Reserves [as] a civilian employee . . . ."

---

[5] This information, taken from the docket, does not reflect the identity of the challenged judge, nor does it shed light on why mother had the opportunity to challenge the assigned judge. We surmise the case was reassigned to a new judicial officer and removed from Judge Pollard's case inventory.

### (3) *February 2011: Father's OSC for Reinstatement of Predeployment Custody*

On February 16, 2011, father filed an OSC, seeking physical custody of minor, modification of the September 2009 custody order, and reinstatement of the 2006 custody order pursuant to section 3047. The hearing was set for March 16, 2011.

### (4) *March 2011: Court Schedules Evidentiary Hearing*

At the March 16, 2011 hearing on father's OSC before Judge McCartin, father, acting in propria persona, argued that the September 2009 custody order was a temporary one and that, pursuant to section 3047, custody should revert to the predeployment custody arrangement without delay, after which mother would have the right to file an OSC to modify custody in minor's best interests. Father argued the Legislature "did not intend that every time somebody goes overseas to fight for their country they should have to come back and then try to establish that they're a good parent all over again." Father argued that minor attended Reynolds Elementary School in Oceanside from kindergarten through the first trimester of fourth grade and had only moved to another school while father was deployed. Father argued minor was now in fifth grade and wanted to return to an Oceanside school.

Mother's counsel objected that father had failed to submit underlying support with his initial pleadings as required under Code of Civil Procedure section 1005, thereby depriving mother of her statutory 16 court days to respond.

The court, while recognizing that section 3047 advocates an "efficient" and "expeditious process," interpreted the statute to *require* a hearing on minor's best interests, at which father would have the advantage of an evidentiary presumption. Under this interpretation, no reversion to a prior custody arrangement could take place until the court determined at a hearing the issue of minor's best interests. In the court's view, the matter "turns into an initial custody case again." The court stated, "I understand the intent of the Legislature says a fair, efficient, expeditious process. Well, that's three things I don't ever see in family law is fair, expeditious, and efficient, because we aren't. We try to be, but it's really hard because we don't have the whole—all the information we need."[6] Judge McCartin further noted that in his personal

---

[6] Judge McCartin's comment may have been made in jest, but humor is usually grounded in a modicum of truth. If so, steps should be taken to remedy this state of affairs. It should not take 12 months to conduct a review of the temporary custody order under section 3047, subdivision (b)(1) when a servicemember returns from a deployment.

experience, he himself did not enjoy frequently changing schools; thus, he would not change minor's school unless minor was having trouble in the current school.

The court placed the matter on the law and motion calendar, "to be supplemented with testimony." Father requested a prompt hearing so that minor could graduate from the Oceanside school. The court continued the hearing to May 6, 2011. The docket reflects the May 6 hearing was continued by stipulation.

### (5) *July 2011: Court Orders Evidence Code Section 730 Evaluation*

Father retained counsel and filed a declaration detailing the dates of his military deployment, mobilization, and temporary duty, along with copies of the custody orders made before September 2009.

When father's OSC finally came on for hearing on July 29, 2011, Judge McCartin made the following statements. If the Legislature intended automatic reversion to the predeployment custody arrangement upon a military parent's return from deployment, the statute would say so. Instead, the legislative history indicates the best interests of the child are paramount. "What [the statute] tries to do is help military personnel from having to do exactly what happened in this case, unfortunately: come back from deployment and get mired in the family law system, which is what has happened in this case, which is horrible. So the way this has gone about up till now has been the antithesis of what the statute was meant to do." The court noted it had "been trying to hint to [father] since last October" that he needed to "file [for] a review hearing" and give the court his deployment information. Thus, father bore "equal responsibility" for the delay. But the court acknowledged that father's OSC had "been tortuously continued to May 6, July 1st and July 8th and today."

As to father's deployment to Afghanistan, Judge McCartin found (1) there was no dispute that Judge Pollard's September 2009 temporary order was made while father was deployed, (2) mother was aware of father's mobilization at least by September 9, 2009, and (3) father had provided the court with proof he was mobilized and deployed to Afghanistan from July 20, 2009, through August 23, 2010.

Father's counsel cited the 2006 custody order's reinstatement directive and asked the court to "short set it for an evidentiary hearing."

The court instead ordered an Evidence Code section 730 evaluation to be conducted by Dr. Miriam Galindo. In the court's view, the section 3047

presumption would only matter if Dr. Galindo could not choose between the parents, in which case father would win.

The court clarified there would be no reversion to the predeployment custody arrangement until the court reviewed the evaluator's report. The court stated, "I feel bad because this is going to delay if we do a 730 . . . ," but expressed its view that father bore some responsibility for the delay by failing to give the court his deployment information when the court requested it in October 2010. The court stated, "[T]he deployment period wasn't [long] here, but I'm dealing with an order when [minor] was five years old and he's almost 11 [years old now]."

### (6) *August 2011: Father's Writ Petition*

On August 19, 2011, father petitioned this court for a writ of mandate directing the trial court "to enter an order providing for the immediate reversion" to the 2006 custody order. Father requested prompt relief so he could enroll minor in father's local school before the start of the school year. On August 25, 2011, we summarily denied father's petition.

### (7) *September 2011: Matter Continued*

The minute order of the September 16, 2011 hearing states, "Dr. Galindo has not completed her report, subsequently, matter is not ready for trial."

### (8) *January 2012: Evidence Code Section 730 Report Completed*

Dr. Galindo completed her report on January 20, 2012. Because this report is confidential, we summarize it only briefly and as necessary. Dr. Galindo, after a thorough investigation and review, concluded it was *not* in minor's best interests to revert back to the original custody arrangement and re-commended that minor remain in mother's primary care. A review of Dr. Galindo's specific underlying conclusions reveals her recommendation was based on her conclusion that minor, at 11 years old and in middle school, was "doing relatively well under the current circumstances," had been in mother's primary custody and had attended the same school district for the past two years, and had an interest in the stability and continuity of the current custodial arrangement.

### (9) *February 2012: Court Refuses to Reinstate Original Custody Arrangement*

At the February 2, 2012 hearing, father's counsel argued that father was deployed for about one year, maintained contact with minor (who was then

age nine) during that time, and visited minor after his return from deployment. The attorney noted that Dr. Galindo found "no mental or physical impairment to [father] due to his deployment [and] no showing of any difference in the circumstances that existed at the time of the deployment" as to the location of the parents' respective homes, "found no evidence of abuse of the child, found no evidence of any health or safety issues in either household, found no psychological or psychiatric distress of the child, found that both parties supported extracurricular activities for the child, found the child was doing as well in school as he was before, found that the child loves both parents and wants to see his father more, found no substance abuse issues with either household, and found no major mood disorders or thought disorders of . . . either party or the child." Father's counsel observed that Dr. Galindo's recommendation that mother have primary care of minor was based on the continuity and stability of the arrangement of minor residing with mother since mid-2009. Father's counsel argued that if the passage of time during father's deployment is a basis for overcoming the section 3047 presumption, then the purpose of the statute is abrogated.

Mother's counsel argued, "I agree with [father's] counsel that I think it would be unreasonable and unfair to look at the time [father] was deployed as a reason to modify the [custody] orders. I even go so far as to say it might be unfair and unreasonable to look at the time that it took from February 2011 to today to have his day in court is unfair." But mother's counsel argued father was responsible for the six-month delay from August 23, 2010, through February 2011. Mother's counsel argued minor had made contacts and friends during the years he had attended mother's local school. Mother's counsel also made the "procedural" argument that although Judge Pollard's order was a temporary one, the parties' OSCs filed prior to September 24, 2009, had yet to be reviewed and should come back on calendar.

The court ruled that the length of time minor was in mother's primary custody was significant to minor's best interests. The court acknowledged the court delay had been unfair to father. Nonetheless, the "effect" of the length of time was important. Father's two deployments, the time between, father's delay, and "delay by the court" had had "a dramatic effect on the child." Both parents were such "good parents" that minor was in middle school and yet willing to move to a school midway between the parents' homes. The court stated minor was in sixth grade and almost 12 years old, and that at this age, his friends and sports "become paramount." The court believed it was not in minor's best interests to "move him out of his current situation," where he was doing well in school and attached to his maternal grandfather. The court stated minor "would be fine" with father, but "it would be not as fine." The court's statement of decision enumerated Dr. Galindo's findings; the benefit of continuity and stability was the only finding weighing against a reversion to predeployment custody.

## DISCUSSION

*The Evolution of Section 3047 Reflects the Legislature's Growing Concern About, and Continuing Efforts to Protect, the Parental Rights of Military Servicemembers*

Father argues this case "is a good example of what returning service members should *not* have to face." He contends he was denied restoration of primary custody based on the passage of time and court delays, "circumstance[s] that [were] beyond his control."

Sadly, father's case is not uncommon. "A consistent problem that has plagued parents returning from extended deployments in which custody arrangements were temporarily altered was the argument by the opposing non-servicemember spouse that the child had become accustomed to the new living arrangements and the child's primary residence should not be transferred again." (Note, *Child Custody Protections in the* Servicemembers Civil Relief Act: *Congress Acts to Protect Parents Serving in the Armed Forces* (2008) 29 Whittier L.Rev. 857, 873.) "Many servicemembers worry, and rightly so, that the temporary changes implemented via a Family Care Plan during a servicemember's deployment will become permanent following their return home." (Note, *Defining the "Fit": The Impact of Gender and Servicemember Status on Child Custody Determinations* (2011) 14 J. Gender Race & Just. 533, 572, fn. omitted.)

"Given the current state of our armed forces and the military commitments requiring the deployment and re-deployment of our nation's citizen-soldiers, the dilemma confronting divorced parents of young children as to how best advance the care of those children in the absence of one parent will undoubtedly recur. Our nation's military presence in Iraq and Afghanistan has stirred several state legislatures into action." (*Faucett v. Vasquez* (2009) 411 N.J. Super. 108 [984 A.2d 460, 473], fn. omitted.) In California, our Legislature has responded to this dilemma with section 3047.

In September 2009, when Judge Pollard issued the temporary custody order, former section 3047 provided in its entirety: "A party's absence, relocation, or failure to comply with custody and visitation orders shall not,

by itself, be sufficient to justify a modification of a custody or visitation order if the reason for the absence, relocation, or failure to comply is the party's activation to military service and deployment out of state."

In March 2011, when the court first considered father's OSC for custody reversion, former subdivision (b)(1) of amended section 3047 provided: "If a party with . . . physical custody . . . receives temporary duty, deployment, or mobilization orders from the military that require the party to move a substantial distance from his or her residence or otherwise has a material effect on the ability of the party to exercise custody . . . rights, a modification of the existing custody order shall be deemed a temporary custody order, which shall be subject to review and reconsideration upon the return of the party . . . . If the temporary order is reviewed upon return of the party . . . , there shall be a presumption that the custody order shall revert to the order that was in place before the modification, unless the court determines that it is not in the best interest of the child."[7] Former subdivision (e) of amended section 3047 provided: "It is the intent of the Legislature that this section provide a fair, efficient, and expeditious process to resolve child custody . . . issues when a party receives temporary duty, deployment, or mobilization orders from the military."[8]

---

[7] The amendment, effective January 1, 2011, slightly revised the preexisting language and designated it as subdivision (a) and added new subdivisions (b) through (e).

[8] In 2012, the Legislature again amended section 3047, effective January 1, 2013. We granted father's request for judicial notice of the legislative history of the 2012 amendment to section 3047. The amended statute *prohibits* a court from ordering an Evidence Code section 730 evaluation as part of its review of a temporary custody order upon the deployed party's return, "unless the party opposing reversion of the order makes a prima facie showing that reversion is not in the best interest of the child." (§ 3047, subd. (b)(2), as amended by Stats. 2012, ch. 116, § 1.) Subdivision (h) of amended section 3047 states the Legislature's intent "that family courts shall, to the extent feasible within existing resources and court practices, prioritize the calendaring of these cases, avoid unnecessary delay or continuances, and ensure that parties who serve in the military are not penalized for their service by a delay in appropriate access to their children." The legislative history of the 2012 amendment identifies, as examples, only two criteria affecting the child's best interests that would weigh against reversion to predeployment custody: "[I]f a child was very young at the time of deployment, a court may allow the deployed parent's custodial time to increase gradually over a period of time, to allow the child to adjust to the revised living arrangement. Alternatively, a returning parent may have mental or physical health issues that affect his or her parenting ability and require an adjustment of the prior custody order." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1807 (2011–2012 Reg. Sess.) as amended Mar. 29, 2012, p. 3.) Father argues that the legislative history of the 2012 amendment establishes that it "clarified" the 2010 amendment of section 3047, and thus the recent amendment applies to this case. We disagree. Despite the presence of language in the legislative history stating the intent of the bill was to "clarify" the existing statute, the amendment plainly adds substantive provisions which are, on the one hand, consistent with a reasonable interpretation and application of the 2010 version of the statute, but which are not necessarily implied by the prior language.

*The Court Erred by Failing to Reinstate the Predeployment Custody Arrangement*

Father contends the court erred by failing to promptly enforce the 2006 reinstatement directive, which he characterizes as "self-[e]xecuting." Alternatively, he argues the court violated section 3047 by denying him an expeditious process, ordering an Evidence Code section 730 evaluation, and then denying him "custody reversion due to lapse of time and continuity and stability of placement."

Although mother agrees with "the general legal contentions as argued by" father's counsel at trial, she argues, "[T]his case is fact driven. If the facts here were that there were no [OSCs] pending when [father] became deployed, that [father] noticed [mother] with a clear letter as to his unavailability, [that] there was no valid [o]rder pending for an [Evidence Code section 730] evaluation, and [that] upon return from deployment without hesitation [father] filed a [m]otion to have his custody reinstated, [then] it should have been. But that is not the fact scenario we have here."

On appeal, we apply a de novo standard of review to the court's interpretation of section 3047 (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856] [interpretation of statute]) and the 2006 custody order's reinstatement directive (*John Siebel Associates v. Keele* (1986) 188 Cal.App.3d 560, 565 [233 Cal.Rptr. 231] [interpretation of effect of judgment]), and to the question of law of whether the court applied the correct legal standard in ruling on father's custody motion and OSC (*In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 100–101 [44 Cal.Rptr.3d 388]). We review the court's factual findings for substantial evidentiary support. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 798 [50 Cal.Rptr.3d 731].) We review the court's decision to appoint an Evidence Code section 730 evaluator for an abuse of discretion. (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 835 [269 Cal.Rptr. 624].)

In mother's first fact-driven argument, she asserts section 3047 simply "does not apply here." She argues, "There is no evidence before the court that [father] was unavailable for his hearing on September 24, 2009 due to military activity. If [father] simply did not appear on September 24, 2009, Judge Pollard's [o]rders issued that date are not in violation of [section 3047]." Mother suggests father "was not deployed until October 31, 2009." Mother then concludes that "Judge Pollard made new custody, visitation and school [o]rders based upon the testimony at hand and [each parent's OSC] before her." Essentially, mother argues Judge Pollard's order constituted a

*predeployment* modification of custody, which father could seek to modify upon his return home by proving that his requested modification was in minor's best interests.

Mother's factual assertions are meritless. Both Judge Pollard and Judge McCartin found to the contrary. In August 2009, father served Judge Pollard and mother with letters documenting his mobilization and deployment and requesting a stay of legal proceedings pursuant to the Servicemembers Civil Relief Act. On September 24, 2009, Judge Pollard found (1) father was deployed, (2) she had received father's "letter saying he's not available until July of next year," and (3) her order was a temporary one, "without prejudice to father," based on his deployment. And in July 2011, Judge McCartin found (1) on September 24, 2009, the date of Judge Pollard's order, father was mobilized or deployed, (2) father notified Judge Pollard of his deployment, and (3) Judge Pollard's September 24, 2009 order was a temporary one necessitated by father's deployment. Judge McCartin also confirmed that the court's file contained letters from father's commanding officer advising that he could not attend the September hearing. Substantial evidence supports these findings.

██ Judge Pollard's order was made "without prejudice to father." "The term 'without prejudice,' in its general adaptation, means that there has been no decision of the controversy on its merits." (*Jones v. City of Los Angeles* (1963) 217 Cal.App.2d 153, 157 [31 Cal.Rptr. 761].) To the extent the September 2009 order could be interpreted as being on the merits of the controversy, i.e., a determination of custody arrangements extending beyond father's deployment, it would have modified the reinstatement directive in violation of father's due process rights, section 3047, and the Servicemembers Civil Relief Act.

Mother next contends father caused almost a year to pass between his return from deployment and the first hearing on his section 3047 motion. Again, Judge McCartin found otherwise. Substantial evidence supports Judge McCartin's finding father was responsible for no more than six months of the delay.[9] In any case, once father filed his February 2011 OSC, he was entitled to the expeditious process envisioned by section 3047.

Alternatively, mother argues that if this "court decides [father] was protected by [section 3047] from [Judge Pollard's order] being issued," then

---

[9] At the February 2, 2012 hearing, father argued he was not responsible for even six months of the delay. He argued that upon his return from Afghanistan, he promptly tried to "get in front of a judge," but the first judge was disqualified by mother's counsel, the second was a commissioner to whom father did not consent, and finally on October 1, 2010, father appeared before Judge McCartin, who continued the matter. In January and February of 2011, father was deployed to Korea.

mother is entitled to her day in court on the two OSCs that were scheduled to be heard on September 24, 2009. She further contends that "Judge McCartin had no choice but to enforce" Judge Pollard's August 2009 order requiring an Evidence Code section 730 evaluation.

We are unpersuaded. First, the appellate record does not contain an August 2009 order requiring an Evidence Code section 730 evaluation. Nor does the appellate record contain a copy of mother's August OSC, which, according to the docket, was filed on August 13, 2009. Nor can we imagine why a section 730 evaluation would have been required in August 2009. Just four and one-half months earlier, the court had found the existing custody order was appropriately in force, there having been no change of circumstances. And later, when Judge McCartin was reciting the history of the case, he noted that on August 13, 2009, the court took father's August 2009 OSC (seeking to change minor's school to a location midway between father's and mother's residence) off calendar. We further note (1) father's predeployment OSC was effectively superseded by his postdeployment OSC and (2) based on the appellate record before us (which, for the earlier days of this litigation, is sparse), mother's September 2009 OSC lacked substance and appeared to be filed in response to father's deployment. In any case, even if mother was entitled to a postdeployment hearing on her September 2009 OSC, she was *not* entitled to delay father's requested reversion without offering any evidence it would be detrimental to minor and by instead relying on the outcome of an Evidence Code section 730 evaluation, in what father argues was a "fishing expedition." In other words, absent the necessary countervailing showing by mother, father was entitled to regain primary physical custody of minor, *after which* mother was free to challenge the custody arrangement and to request an Evidence Code section 730 evaluation at any time pursuant to the available legal process.

Accordingly, having rejected mother's assertion the 2006 custody order was permanently modified by Judge Pollard's temporary order, we conclude the 2006 order's reinstatement directive was still in effect when father returned home. Father argues the reinstatement directive is self-executing. It is true the order is, by its terms, unconditional. Nonetheless, we are loath to consider a previously issued court order to be wholly self-executing as to future custody changes. In our view, when a court is asked to enforce such an order, it should conduct a *limited* inquiry into the child's best interests. (§§ 3022, 3087 [court may modify joint custody order to protect child's best interests whenever necessary or proper].) In that manner, the reinstatement directive would be applied consistently with section 3047, which creates a presumption that the custody order *will* revert and requires a "fair, efficient, and expeditious process" (*id.*, subd. (h)) to make the determination. In conducting the limited inquiry, the court's analysis of the child's best interests should be restricted to the types of serious concerns suggested

by the legislative history of the 2012 amendment to section 3047. Thus, the reinstatement directive of the 2006 custody order should have been enforced unless mother made a prima facie showing of serious concerns such as (1) minor's young age at the time of father's deployment suggested that a transitional period might be needed to ease minor back into the original parenting arrangement or (2) father suffered mental or physical health problems that impaired his ability to parent.

■ No such concerns were present here. Nor did mother make *any* prima facie showing of minor's best interests. The court should have returned primary physical custody to father at that point. The court erred by refusing to enforce the reinstatement directive pending the completion of the Evidence Code section 730 evaluation and a subsequent evidentiary hearing.

Dr. Galindo's report, however, is now complete and we will not ignore it. In the interests of judicial economy, we will apply the correct legal standard in deciding whether its analysis and conclusions are sufficient to justify the court's refusal to enforce the reinstatement directive. Our review of Dr. Galindo's confidential report assures us that her recommendation against reversion to predeployment custody was based solely on the benefit minor would derive from continuity and stability—criteria which *always* favor the nondeployed parent and which further favored mother in this case due to the erroneous delays ordered by the trial court. If the benefit of continuity and stability, without more, were sufficient to overcome the statutory presumption, or, alternatively, were sufficient to modify the terms of the reinstatement directive, neither the statute nor the directive would have meaning. Dr. Galindo's report reveals the best interests evaluation was a close case. Minor expressed his willingness to move to a school midway between parents, thereby showing he is not wedded to mother's local school. Minor also said he wants to see father more. Judge McCartin found father and mother are "both really good parents" and that minor would be fine with father, just "not as fine." Judge McCartin further stated, "[M]y interpretation is that the interest in continuity and stability of the current arrangement outweighs the presumption by not a great amount." We conclude that, even in light of Dr. Galindo's report, the court's refusal to enforce the reinstatement directive was erroneous.

## DISPOSITION

The March 6, 2012 order is reversed and the 2006 custody order is reinstated, subject to a hearing on the sole issue whether the reinstatement of the 2006 custody order should be effective immediately, or effective upon the

completion of the current school year. The trial court is directed to hold a hearing on this issue within 20 days of this court's issuance of its remittitur. Father shall recover his costs on appeal.

Fybel, Acting P. J., and Thompson, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 27, 2013, S208577.