Filed 11/20/14  Spencer v. Sharp Grossmont Hospital CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NATHAN J. SPENCER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SHARP GROSSMONT HOSPITAL et al.,<br><br>Defendants and Respondents. | D064653<br><br><br>(Super. Ct. No. 37-2008-00065974-<br>CU-PO-EC) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Nathan J. Spencer, in pro. per., for Plaintiff and Appellant.

Higgs, Fletcher & Mack, LLP, John Morris and Susan E. Basinger for Defendants and Respondents Sharp Grossmont Hospital and Sharp Healthcare.

La Follette, Johnson, De Haas, Fesler & Ames, James J. Wallace II, N. Ben Cramer and David J. Ozeran for Defendants and Respondents Michael L. Butera, Yu D. Cheng, C. Eric Orr, George Z. Fadda and Tu N. Truong.

Neil, Dymott, Frank, McFall & Trexler, Michael T. Ratay, Robert W. Frank, Matthew R. Souther and Christine Dixon for Defendants and Respondents H. Y. Elsheikh and Neelakantan Ramineni.

Plaintiff and appellant Nathan J. Spencer, who is currently imprisoned at the state prison in Chowchilla, filed this action in propria persona against Sharp Grossmont Hospital and Sharp Healthcare (together, Sharp), as well as individual doctors, Michael L. Butera, C. Eric Orr, Yu Dennis Chen, George Z. Fadda, Tu N. Truong, Neelakantan Ramineni, and H. Y. Elsheikh (collectively, the doctors), arising out of the death of his mother, Mary Spencer, while being treated at Sharp. Although Nathan's[1] complaint is not a model of clarity it appears he is asserting claims for medical malpractice and wrongful death.

Sharp and the doctors filed motions for summary judgment. Nathan did not file opposition to the motions. Instead, he filed five motions, which we shall address, *post.* The court granted the motions, finding (1) Nathan's failure to file opposition supported granting the motions, (2) the defendants had established that the treatment of Mary fell within the relevant standard of care, and (3) the five motions Nathan filed in response instead of opposition on the merits were unavailing.

Nathan appeals, again acting in propria persona. As with his complaint, the 50-page handwritten opening brief is rambling, difficult to decipher, and for the most part does not cite to the record. It appears that Nathan's brief asserts (1) the trial court should

---

[1] In the interests of clarity, we refer to Nathan and Mary Spencer by their first names. We intend no disrespect.

have compelled production of Mary's complete medical, insurance and billing records; (2) the trial court should have appointed counsel and an expert for him; (3) the trial court should have continued the hearing on the defendants' motions for summary judgment; (4) defendants' expert declarations had no evidentiary value; and (5) he did not need an expert on the standard of care. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Sharp's Treatment of Mary*

Mary had an extensive medical history, including type-2 diabetes, hypertension, progressive dementia, end-stage renal disease, dialysis, behavioral issues, schizophrenia and bipolar disorder.

On March 17, 2008, when Mary was 74 years old, she was examined by Dr. Cheng. Although a definitive diagnosis was not determined, it was suspected that she had a seizure. On March 18, 2008, Mary was examined by Dr. Fadda, who noted she was shaking with chills and had an altered mental state. The next day, Mary was examined by Dr. Butera. He noted she had a history of recent sepsis, nausea, and vomiting over a 24-hour period. She was admitted and noted as having chronic renal failure, urinary tract infection, and uncontrolled hypertension.

On April 7, 2008, Mary arrived at Sharp's emergency room, after having suffered cardiac arrest that evening. The staff at Brighton Place, the assisted living facility where she was residing, noted that on the evening of April 7 she was short of breath. Ten minutes later, when staff returned to check on her, they found her unresponsive. Staff immediately called 911 and initiated CPR. Once Mary arrived at Sharp, after an hour and

3

a half of treatment doctors were able to reestablish a pulse and Mary was stabilized such that she was able to be taken to the intensive care unit. Despite the doctors' efforts, Mary passed away the following evening at approximately 7:00 p.m. Her cause of death was listed as (1) brain death; (2) cardio respiratory arrest; (3) possible cardiac arrhythmia; (4) heart disease; and (5) chronic renal failure.

Dr. Michael Marenchic described the events leading up to Mary's death:

"The patient is a 74-year-old female who is the subject of a cardiopulmonary arrest presentation on morning of 4/7/08 at 49 minutes after midnight. She is the patient of Dr. Tu Truong, was brought to the hospital from Brighton Place because of a cardiopulmonary arrest suffered at the home and she arrives with her resuscitation papers and clearly indicating that she was a full code."

Dr. Marenchic also described Mary's medical history and further efforts to address her condition:

"This is [a] lady who has had a very strong history of cardiopulmonary compromise in the past with history CHF, insulin-dependent diabetes mellitus. She is a dialysis patient [hemodialysis] with a functioning shunt in her right arm, GERD, hypertension, obviously end-stage renal disease, also schizophrenia and subdural hematoma . . . and ulcer disease. The patient arrives under full CPR. We assessed her and she lost her pulses and we reinitiated the cardiopulmonary resuscitative efforts giving her epiphrine and atropine, bicarb, and managed to obtain a return of the pulse in field. She had been pulseless and apneic for approximately 30 minutes before any pulse was obtained by the standard cardiopulmonary resuscitative efforts."

Dr. Marenchic further noted that Mary's condition was an "extremis situation and was treated as such by us." Dr Marenchic also stated that Mary had been recently seen at Grossmont's emergency department, suffering from nausea, vomiting, and chronic renal

4

failure. She was hospitalized, stabilized, and returned home. However, after she developed a urinary tract infection and was weak, she was returned to Brighton Place.

Dr Marenchic's report further stated, "[T]onight, the patient came in because of the cardiopulmonary arrest and basically, the first pattern that we obtained was atrial fibrillation with premature aberrantly conducted complexes, rate of 60, and a QRS of 118, suggesting acute MI. [¶] I sent the EKG to Dr. Kafri, our cardiologist on call. He felt that there was not an acute MI. After we sent that, then we lost her pulses completely, retrieved her with the use of atropine, epinephrine, and bicarb, and a closed-chest massage until the pulses returned and then the cardiogram after that showed a sinus tach, pulmonary disease pattern, right bundle branch block, and I talked to Dr. Kafri several times."

Thereafter, Mary went in and out of cardiac arrest several times, each time going into a flat-line situation with loss of pulses and respiratory effort and then being retrieved again with atropine, epinephrine and bicarbonate.

Several family members were noted as being present. Dr. Sherry Braheny opined that she had "no hope for recovery as the patient satisfies criteria for clinical brain death at this time. [¶] Since the family has been somewhat resistant to the idea of her nonrecovery, I have discussed this with Dr. Pokala. He is in agreement with ordering brain study for the a.m. with reevaluation after the study. I have again advised the patient's family to prepare for the worst. They appear to fully understand my prognosis is virtually nil any recovery."

5

To satisfy the family a repeat CT scan was performed, along consultations with neurologists, social workers, and a nephrologist.

The interdisciplinary progress note of 12:31 p.m. on April 8 stated:

> "Process explained to family at bedside along with expectations. Family agreeable and wanting a little more time with patient. Pt extubated at 1830 with no observable respiratory effort. Heartbeat stopped at 1901. Daughter at bedside along with additional family state pt had no belongings with her. Death report completed and signed by daughter, Valerie Oliver."

B. *Procedural Background*

1. *Original complaint/demurrer/appeal*

Nathan's original complaint is not included in the record on this appeal. However, there was an appeal from the trial court's sustaining of defendants' demurrer to that complaint, which describes the claims in that action. (*Spencer v. Sharp Grossmont Hospital* (Oct. 17, 2011, D056408) [nonpub. opn.] (*Spencer I*).) Nathan asserted a cause of action for wrongful death resulting from negligence and "intentional misconduct that caused[d] physical pain and transferred intent." (*Spencer I,* at p. 2.) Nathan further alleged that "his sister attacked his mother, [Mary], which 'induce[d] an asthma attack causing [her] to lack oxygen to the brain for 5 plus minutes.'" (*Ibid.*) Nathan alleged that she was taken to Sharp's emergency room, and the "nurses and doctors lacked training in proper cardiopulmonary resuscitation; ventilator treatment for asthma patie[nts] wrong medication or medications at wrong time and more deficiencies that are significant. [Mary] did die at the hands of [Sharp's] staff and . . . ordinary care was not provided." (*Ibid.*)

6

"Sharp demurred to Spencer's complaint and the trial court sustained the demurrer without leave to amend, finding the complaint failed to 'indicate any factual basis for liability,' or specify facts regarding 'how [Mary] died and what defendants did to contribute to that death.'" (*Spencer I, supra,* at p. 2.)

Nathan appealed and, on October 17, 2011, this court issued an unpublished opinion, reversing the trial court. In doing so, we concluded that Nathan "adequately alleged Sharp owed his mother a duty of care and infer from the facts pleaded that Sharp breached that duty." (*Spencer I, supra,* at p. 8.) We further concluded that Nathan failed to properly plead "the element [of] causation needed to allege actionable negligence in a claim for wrongful death," and therefore "the trial court did not err in sustaining Sharp's demurrer as to the wrongful death cause of action." (*Ibid.*)

However, we concluded that an amendment to cure those defects was not "facially implausible," and that "[i]n the interest of justice, the trial court should have granted Spencer the opportunity to amend his original complaint to cure the specified defects." (*Spencer I, supra,* at p. 11.)

2. *Amended complaint and motions for summary judgment*

Following remand, Nathan filed an amended, handwritten, complaint that is not a model of clarity. Although unclear, it appears the complaint alleges that defendants were guilty of medical malpractice for prescribing Abilify and Seroquel to Mary.

Sharp thereafter filed a motion for summary judgment, asserting that it was not legally responsible for any alleged wrongful conduct because its nursing staff "met and exceeded the standard of care and/or was not the legal cause of harm to [Mary]." The

7

motion was supported by a declaration from Sharp's expert witness, Dr. Howard Bessen, detailing how Sharp staff met or exceeded the standard of care with respect to their treatment of Mary, and that nothing the staff did was a cause of harm to her. Specifically, Dr. Bessen opined that the nursing staff "performed their duties and services with respect to the care and treatment of [Mary] well within the standard of care for nursing staff in a critical care setting," and the nursing staff "completed all tasks that would be required of nurses assisting a physician in such settings." Dr. Bessen also noted that nursing staff "do not prescribe medications to patients." That was accomplished by physicians.

Drs. Butera, Orr, Cheng, Fadda and Truong filed their own motion for summary judgment, which was supported by a declaration from their expert, Dr. Daniel J. Bressler. He opined that Mary's death was not related to the prescribing of Seroquel, Ablify, or any other medication. Rather, her death was caused by severe heart disease, end stage renal disease, congestive heart failure, and diabetes, and "[h]er death resulted from a natural progression of these chronic illnesses." He also opined that the type and dosage of medications prescribed to Mary was appropriate.

Drs. Ramineni and Elsheikh filed their own motions for summary judgment. Their motions were supported by their own declarations, as physician experts, that Mary's treatment was within the standard of care.

Nathan filed no opposition to any of the motions. However, as we shall discuss in more detail, *post*, he objected to the hearing going forward based on several motions he had filed.

8

### 3. *Court's ruling*

The unopposed motions were heard on August 30, 2013. Nathan appeared telephonically.

The court granted all the defendants' motions for summary judgment. The court noted that the basis of the lawsuit was defendants' "purportedly prescribing Abilify and Seroquel to his mother [Mary], and his claims amount to medical malpractice, if anything." The court found the defendants met their initial burden of proof that her treatment fell within the standard of care. The court also found that the defendants' evidence refuted Nathan's other claims.

The court also noted summary judgment was proper because Nathan failed to file any opposition to the summary judgment motions. In doing so, the court stated that "[Nathan's] burden is to show, through competent admissible expert testimony, that the care and treatment given by Defendant caused or significantly contributed to [Mary's] alleged injuries." The court further stated, "[Nathan] has failed to set forth any evidence whatsoever and has failed to oppose the motions." "[T]he moving Defendants have met their initial burden to show that all of the causes of action have no merit and [Nathan] has failed to set forth or even suggest a triable issue of material fact."

The court also addressed Nathan's five motions (which will be analyzed in more detail, *post*), (1) seeking the appointment of counsel to assist him with his case; (2) seeking the appointment of a medical expert to review Mary's medical records; and (3) three separate motions seeking to compel Sharp to produce Mary's medical, billing and insurance records. The court denied those motions.

9

DISCUSSION

## I. *STANDARDS GOVERNING SUMMARY JUDGMENT MOTIONS*

The summary judgment procedure is directed at revealing whether there is evidence that requires the fact-weighing procedure of a trial. "'[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves.' [Citation.] The trial judge determines whether triable issues of fact exist by reviewing the affidavits and evidence before him or her and the reasonable inferences which may be drawn from those facts." (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131.) However, a material issue of fact may not be resolved based on inferences if contradicted by other inferences or evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.)

"The evidence of the moving party [is] strictly construed, and that of the opponent liberally construed, and any doubts as to the propriety of granting the motion [are to] be resolved in favor of the party opposing the motion." (*Branco v. Kearny Moto Park, Inc*. (1995) 37 Cal.App.4th 184, 189.) The trial court does not weigh the evidence and inferences, but instead merely determines whether a reasonable trier of fact could find in favor of the party opposing the motion, and must deny the motion when there is some evidence that, if believed, would support judgment in favor of the nonmoving party. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139, disapproved on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 524.) Consequently, summary judgment should be granted only when a moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

10

Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable issue of material fact. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 582; *Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 723.) In practical effect, we assume the role of a trial court and apply the same rules and standards governing a trial court's determination of a motion for summary judgment. (*Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1121-1122.) We liberally construe the evidence in support of the party opposing summary judgment (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142) and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards. (Cf. *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.)

## II.  *NATHAN'S FAILURE TO CITE TO THE RECORD*

Defendants contend Nathan's claims should be deemed forfeited because he failed to include citations to the record as required by California Rules of Court, rule 8.204(a)(1)(C).

We agree Nathan's opening brief is deficient because rule 8.204(a)(1)(C) requires that briefs "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  "'When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly

11

made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited.'" (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 800.) Further, although Nathan is a litigant in propria persona, he is to be treated to "the same, but no greater consideration than other litigants and attorneys." (*Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1210.)

Therefore, to the extent Nathan's contentions are not supported by citations to the record, we are entitled disregard those portions of his opening brief. Nevertheless, we elect to disregard this noncompliance and address the merits of Nathan's appeal.

### III. *FAILURE TO OPPOSE SUMMARY JUDGMENT MOTION*

" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived.' " (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11, fns. omitted; see *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 862 [an appellate court will not consider matters outside the record on appeal].)

Moreover, in a medical malpractice action such as this, "'[w]hen a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless plaintiff comes forward with conflicting expert evidence.'" (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 985 (*Munro*).)

12

Thus, because Nathan did not file any opposition to the motions for summary judgment, he has forfeited the right to challenge the ruling granting defendants' motions on appeal. As detailed, *ante*, the defendants submitted expert declarations detailing how the care provided to Mary met or exceeded the applicable standard of care. Because Nathan failed to oppose the motions, and failed to provide any expert evidence to the contrary, the court did not err in granting defendants' motions for summary judgment.

## IV. *NATHAN'S MOTIONS*

In response to defendants' summary judgment motions, rather than filing opposition Nathan filed motions seeking to (1) have counsel appointed for him, (2) have an expert appointed for him, and (3) compel production of Mary's medical records. Defendants opposed these motions, and the court denied them. On appeal, Nathan appears to challenge that ruling. We conclude the court did not err in denying those motions.[2]

### A. *Background*

#### 1. *Motion to appoint counsel*

Nathan brought a motion requesting that the trial court appoint counsel to represent him in this action. He based the motion on the fact that he was "indigent," suffered from a "disability of imprisonment," and he had "never brought a civil case as such to trial."

---

[2] Nathan filed two requests for judicial notice, requesting that we take judicial notice of these motions, as well as the proofs of service related to these motions. However, as these motions appear in the augmented clerk's transcript, we need not take judicial notice of them.

13

Sharp opposed the motion on the basis that Nathan had no right to the appointment of counsel in a civil case under either state or federal law.

The court denied the motion, finding that because his causes of action "would not deprive [him] of his personal liberty or deprive him of any property interests if he should not prevail on the merits of the action" he was not entitled to appointed counsel.

2. *Motion to appoint expert*

Nathan also brought a motion seeking to have the court appoint an expert for his action. Nathan asserted that he would be "prejudiced if no medical expert [was appointed] on behalf of [an] indigent, pro-se plaintiff disabled by imprisonment . . . ."

Sharp opposed the motion, arguing that "the law does not allow the appointment of an expert so that a prisoner can prosecute his own case."

The court denied the motion, noting that question rested within the court's discretion and that appointment of an expert in a civil case is rarely done.

3. *Three discovery motions*

Nathan brought three separate discovery motions, seeking all medical, billing and insurance records regarding Mary's treatment.

Sharp opposed the motions, asserting that Nathan had failed to serve a request for production of documents, as required by the Code of Civil Procedure. Sharp also argued the motion was untimely.

The court denied the three motions to compel, finding that Nathan had not identified or included any request for production or subpoena, and that the request was untimely.

14

B. *Analysis*

1. *Motion to appoint counsel*

"A prisoner may not . . . compel a trial court to appoint counsel. [Citations.] The right of an indigent prisoner to appointed counsel in a civil action arises *only when there is a bona fide threat to his or her personal or property interests and no other feasible alternative exists.*" (*Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 793, italics added.)

Here, Nathan has not shown there is a "bona fide threat to his personal or property interests" if counsel were not appointed for him. Accordingly, the court did not err in denying that motion.

2. *Motion to appoint expert*

Evidence Code section 730 provides in part:

> "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

Evidence Code section 730 does not confer an absolute right upon a party in a civil action to have an expert appointed. Rather, the matter is left to the trial court's sound discretion. (*In re Marriage of E.U. & J.E.* (2012) 212 Cal.App.4th 1377, 1389.) Moreover, "[i]n practice, courts rarely use this power in civil cases." (Wegner, Fairbank, Epstein & Chernow, Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2013) [¶] 8:722, p. 8C-93, rev. #1, 2013, italics omitted.)

15

Nathan has provided no facts or authority demonstrating the court abused its discretion in not appointing an expert in his civil malpractice case.

3. *Discovery motions*

With regard to Nathan's three discovery motions, seeking to compel production of Nancy's medical, billing and insurance records, the court did not err in denying those motions.

First, as the court noted, Nathan did not comply with the discovery statute by serving a request for production of documents and timely bringing a motion to compel production of the documents.

Code of Civil Procedure section 2031.010 provides in part:

"(a) Any party may obtain discovery within the scope delimited by Chapters 2 (commencing with Section 2017.010) and 3 (commencing with Section 2017.710), and subject to the restrictions set forth in Chapter 5 (commencing with Section 2019.010), by inspecting, copying, testing, or sampling documents, tangible things, land or other property, and electronically stored information in the possession, custody, or control of any other party to the action. [¶] (b) A party may demand that any other party produce and permit the party making the demand, or someone acting on that party's behalf, to inspect and to copy a document that is in the possession, custody, or control of the party on whom the demand is made."

Code of Civil Procedure section 2031.310 provides in part:

"(a) On receipt of a response to a demand for inspection, copying, testing, or sampling, the demanding party may move for an order compelling further response to the demand if the demanding party deems that any of the following apply: [¶] (1) A statement of compliance with the demand is incomplete. [¶] (2) A representation of inability to comply is inadequate, incomplete, or evasive. [¶] (3) An objection in the response is without merit or too general. [¶] (b) A motion under subdivision (a) shall comply with both of the following: (1) The motion shall set forth specific facts showing

16

good cause justifying the discovery sought by the demand. [¶] (2) The motion shall be accompanied by a meet and confer declaration under Section 2016.040. (c) Unless notice of this motion is given within 45 days of the service of the verified response, or any supplemental verified response, or on or before any specific later date to which the demanding party and the responding party have agreed in writing, the demanding party waives any right to compel a further response to the demand."

Here, it is undisputed that Nathan did not serve a request for production of documents, file a motion to compel as required by Code of Civil Procedure section 2031.310, did not submit any points and authorities explaining the legal basis for compelling documents, or otherwise comply with the requirements of the Code of Civil Procedure. Accordingly, the court did not err in denying Nathan's discovery motions.

V. *DECISION TO PROCEED WITH SUMMARY JUDGMENT MOTIONS*

Nathan also asserts that the court erred in proceeding with the summary judgment motions because the court engaged in "deception" because he was told that he "would be able to review and copy [Mary's] medical records before a summary judgment ruling would be made."

However, Nathan does not cite to the record wherein that representation was allegedly made. Moreover, he does not explain why he failed to serve a request for production of those records in time to review them prior to the time for his opposition to the motion for summary judgment. Therefore, the court did not err in proceeding with the motions for summary judgment.

17

## VI. *SUFFICENCY OF EXPERT DECLARATIONS*

Nathan asserts that "none of the doctors' experts' opinions or declarations refute nor give expert testimony as to the safety of said drugs . . . and their safe use for dementia patients who are elderly female depend[e]nts." This contention is unavailing.

As we have discussed, *ante*, defendants' experts detailed their expertise and the scope of their review of the prescribing of drugs to Mary. They then proceeded to conclude why the actions of Sharp health care providers were well within or exceeded the standard of care.

Again, once that testimony was submitted, the burden shifted to Nathan to show through his own expert testimony that a triable issue of fact existed as to that issue. However, as we have discussed, Nathan submitted no opposition, and the trial court was therefore correct in finding that defendants' treatment of Mary fell within the applicable standard of care.

## VII. *NATHAN'S FAILURE TO SUBMIT EXPERT TESTIMONY*

Finally, Nathan asserts that he was not required to provide expert testimony in response to the motions for summary judgment. We reject this contention.

As we have discussed, *ante*, "'[w]hen a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless plaintiff comes forward with conflicting expert evidence.'" (*Munro, supra,* 215 Cal.App.4th at p. 985.)

18

DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.

19