Filed 3/30/23  Scaccia v. Kennedy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| BRIAN SCACCIA, | C093627 |
| Plaintiff and Appellant, | (Super. Ct. No. CV-2014-1820) |
| v. | |
| DANIEL KENNEDY et al., | |
| Defendants and Respondents. | |

Plaintiff Brian Scaccia (Plaintiff) representing himself, appeals from (1) summary judgment granted in favor of defendants Daniel Kennedy, M.D. (Dr. Kennedy) and Sutter Davis Hospital (Sutter) (collectively Defendants), and (2) "all underlying rulings" in this case.  Plaintiff's claims against Defendants arise out of care and treatment they provided to his mother, Anne Ringkamp, who died at Sutter in November 2013 following a two-week hospitalization.  We affirm.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

An appellant's opening brief must contain "a summary of the significant facts" relevant to the issues raised in the appeal. (Cal. Rules of Court, rule 8.204(a)(2)(C).) A summary is particularly important in a case like this, where both the judgment and all underlying rulings are challenged on appeal, and where the record is over 20,000 pages. Without a complete and cohesive summary, we do not know what it is we are being asked to review. The entirety of Plaintiff's summary of significant facts is as follows:

> "Decedent, an underweight functional 81-year-old senior moved to Davis in late-August 2013. The Sutter primary care physician ('PCP') placed Decedent in a Sutter-run grant-capped program ('AIM').

> "Decedent suffered a stroke (09-27-2013). Treatment began upon admission to [Sutter] but withdrawn (for financial reasons, i.e., grant cap and discovery of prior malpractice) without consent on fraudulent cancer claims after Plaintiff left; Decedent returned suffering asthma (11-10-2013); Defendants entrapped, imprisoned, tortured, and asserted various fraudulent alibis (due to botched murderous attempts) before massively overdoing Decedent (~46-times the morphine equivalent of fentanyl used for the previous day's unconsented operation, a month's prescription of Ativan, etc.) when mimicking a MRSA respiratory infection."

As just noted, the record is over 20,000 pages. It spans 28 volumes. The index alone is over 130 pages. With some help from Defendants' briefing, we have attempted to briefly summarize what appear to be the most relevant facts, in order to give an overview of the proceedings in the trial court. Additional facts will be discussed in the relevant discussion sections, below.

*The Complaint*

This case begins with the filing of the first amended complaint on January 9,

2

2015.[1] It contains 251 paragraphs of factual allegations, most of which have nothing to do with Dr. Kennedy or Sutter. Instead, most of the allegations deal solely with Plaintiff, his brother John, and their mother, Anne.[2] According to those allegations, Anne lived in Ohio from 1997 to 2013. She lived next door to John, in a house she rented from him. The complaint contains a litany of accusations against John, including that he hated his mother, he tricked her into signing her penultimate will, he stole or converted large sums of money from her, and he extorted money from Plaintiff.

The complaint continues that at some point in time, Anne became unable to care for herself and was dependent on John to ensure she had food, housing, and medical care. By 2013, she was food deprived and weighed only 80 pounds. Her house was so dirty that healthcare workers refused to sit down when they visited her. John withheld medicine from her. Her health declined. She had chronic obstructive pulmonary disease. In July 2013, a social worker reported Anne's situation to Ohio Adult Protective Services because she believed Anne was not getting sufficient food, medical care, or assistance with activities of daily living.

In August 2013, Plaintiff moved Anne to California to live with him. The move was contentious. Plaintiff accused John of abusing Anne, and John accused Plaintiff of taking Anne against her will and of undue influence. Police were called more than once.

By early August 2013, Anne and Plaintiff were living in California. Anne suffered from health problems that Plaintiff suspected were caused by John's abuse. He scheduled visits to doctors in hopes of reversing her decline.

On September 26, 2013, Plaintiff took Anne to the Sutter emergency room because she appeared to have suffered a stroke and was having difficulty breathing. A

---

[1] The original complaint was filed on November 12, 2014, but was never served.

[2] We refer to John and Anne by their first names to avoid confusion, and mean no disrespect.

3

scan of Anne's lungs revealed a liver tumor. Dr. Kennedy, one of Anne's treating physicians at Sutter, stated it was probably caused by metastatic cancer elsewhere in the body and that Anne was dying of cancer, but he refused to do tests to determine if she actually had cancer. Dr. Kennedy wanted to discontinue Anne's appetite stimulant and would not take measures to help her gain weight because he believed that increased food consumption would feed the tumor and hasten her death. He stated her quality of life had deteriorated so much that it was not worth prolonging. Plaintiff disagreed and stated it was premature to treat Anne as if she had terminal cancer, and that her poor health was likely the result of her awful living conditions in Ohio. After Anne was discharged from the hospital, she told Plaintiff she wanted aggressive treatment.

On November 10, 2013, Anne returned to Sutter with severe respiratory distress. Within days, she had contracted an antibiotic-resistant infection, and was placed on a ventilator. Dr. Kennedy claimed Anne was in pain and he sought Plaintiff's permission to remove Anne from the ventilator. Plaintiff refused. Plaintiff told Dr. Kennedy about John's abuse and neglect of Anne. He also told Dr. Kennedy that Anne had an advanced health care directive (AHCD) naming him as her agent and instructing doctors not to contact John if she were seriously ill or dying. Dr. Kennedy did not attempt to obtain a copy of Anne's AHCD and instead contacted John and let him make decisions about Anne's care and treatment. John and Dr. Kennedy made plans to "euthanize" Anne. Anne began bleeding from her lungs, and a lab test suggested "foul play" because it found "plant matter" in her lungs. Plaintiff believes someone intentionally stuck a branch down Anne's ventilator tube and put plant matter into her lungs "to wound her, perhaps mortally." With John's approval, the ventilator was removed on November 23, and Anne died that day.

After Anne's death, John filed a lawsuit in Ohio claiming that he was Anne's sole heir, and that Plaintiff had abused her, kidnapped her, stolen money from her, and caused

4

her tumor and her death. In April 2014, John "usurped Anne's will and obtained a default judgment . . . against" Plaintiff.

Based on these allegations, Plaintiff sued John, Dr. Kennedy and Sutter, both on his own behalf and on behalf of Anne.[3] The complaint contains 22 causes of action, seven of which are asserted against Dr. Kennedy and/or Sutter: (1) false light; (2) defamation; (3) fraud; (4) medical negligence; (5) wrongful death; (6) "decisions law" (based on Defendants' alleged failure to follow Anne's wishes as stated in her AHCD); and (7) breach of confidentiality.[4] As asserted on behalf of Anne, these causes of action are survival causes of action (i.e., causes of action that existed while a person was alive and that survive the person's death), which may only be commenced "by the decedent's personal representative or, if none, by the decedent's successor in interest." (Code Civ. Proc., § 377.30.)[5]

*Demurrers and Motion to Dismiss*

On March 16, 2015, Sutter filed a demurrer to the complaint, arguing the cause of action for false light was uncertain, and the remaining causes of action failed to state facts sufficient to constitute a cause of action against it. Sutter also argued Plaintiff lacked standing to bring the survival causes of action because he did not allege he was Anne's personal representative or successor in interest. Plaintiff responded by asking for a continuance in order to perfect his right to bring claims on Anne's behalf and to conduct discovery to defend against the demurrer. The trial court denied Plaintiff's request for a

---

[3] He also sued an entity identified as "Sutter Medical Foundation," which successfully demurred to the complaint. The trial court entered judgment in its favor, Plaintiff appealed, and we affirmed. (See *Scaccia v. Sutter Medical* Foundation (Dec. 3, 2018, C084799) [nonpub. opn.].) We thus do not discuss Sutter Medical Foundation further.

[4] The remaining causes of action are asserted against John only.

[5] Further undesignated statutory references are to the Code of Civil Procedure.

5

continuance. On April 29, 2015, the trial court overruled the demurrer as to the wrongful death cause of action, and sustained it with leave to amend as to all other causes of action, finding (1) the complaint failed to allege Plaintiff had been appointed as Anne's personal representative, (2) the cause of action for false light failed to allege what information Sutter publicized that showed plaintiff(s) in a false light, and (3) the complaint failed to state facts sufficient to constitute the other causes of action. A subsequent order stated the amended complaint had to be filed by August 6, 2015.

In the meantime, on June 8, 2015, Dr. Kennedy filed a demurrer that largely repeated Sutter's arguments. Once again, Plaintiff sought a continuance, and, once again, the trial court denied the request. On August 13, 2015, the trial court overruled the demurrer as to the wrongful death cause of action, and sustained it with leave to amend as to all other causes of action for the same reasons it gave when ruling on Sutter's demurrer. The amendment had to be filed within 10 days. (Cal. Rules of Court, rule 3.1320(g).)

Plaintiff failed to file an amended complaint within the time allowed, and on October 9, 2015, Dr. Kennedy filed a motion to dismiss all claims but the wrongful death claim, and Sutter joined in that motion. The motion was based on section 581, which provides, "The court may dismiss the complaint as to [a] defendant when: [¶] . . . [¶] (2) . . . after a demurrer to the complaint is sustained with leave to amend, the plaintiff fails to amend it within the time allowed." (§ 581, subd. (f)(2).) The trial court granted the motion on November 30, 2015, finding Plaintiff "has not shown good cause for failing to file an amended complaint." Following this ruling, the only cause of action remaining against Dr. Kennedy and Sutter was for wrongful death.

*The 2016 Summary Judgment Motions*

In January 2016, Dr. Kennedy filed a motion for summary judgment on the ground that the undisputed facts showed his care and treatment of Anne complied with the standard of care. In April 2016, Sutter filed a similar motion. On November 18, 2016,

the trial court denied both motions because Defendants had included in their separate statements a fact that Plaintiff disputed—namely, that he consented to the removal of his mother's ventilator.

*The 2016 Motions to Amend*

On June 29, 2016, while the summary judgment motions were pending, Plaintiff filed a motion for leave to amend. The court denied the motion on procedural grounds (failure to include the supporting declaration required by Cal. Rules of Court, rule 3.1324).

On August 29, 2016, Plaintiff filed another motion for leave to amend, stating he wanted to "clarify" the allegations in the complaint, restore some of the previously dismissed claims, add a new claim for battery, add a new claim for conspiracy, and add a claim for punitive damages pursuant to section 425.13. On November 28, 2016, the court denied the motion with prejudice, noting: "1. On April 29, 2015, and August 13, 2015, this Court issued Orders sustaining both [Sutter's] Demurrer and Dr. Kennedy['s] Demurrer, both with leave to amend. [¶] 2. Notwithstanding the Court's Orders, Plaintiff did not seek to file an Amended Complaint until over one year later, on September 16, 2016.[6] [¶] 3. Plaintiff was given over a year's time to file an amended complaint. [¶] 4. In the absence of new facts or law, the Court finds that Plaintiff's delay to file an amended complaint is inexcusable."

On October 24, 2016, Plaintiff filed a motion for reconsideration of the order denying him leave to amend. On December 14, 2016, the court denied the motion for

---

**6** This date appears to be an error. As noted, Plaintiff filed a procedurally noncompliant motion on June 29, 2016, and a procedurally compliant one on August 29, 2016.

reconsideration because it was not based on new or different facts, circumstances or law. However, it did grant him leave to rename certain defendants.[7]

*Request to Appoint an Expert*

In July 2018, Plaintiff filed a motion asking the court to appoint an expert and an "attorney limited to expert testimony issues." In support of the motion, he acknowledged he would need an expert in order to prove his case, but stated he could not afford to pay an expert and the experts he had contacted were only willing to work with attorneys. He cited Evidence Code sections 730 and 731, which provide the court may appoint an expert in certain circumstances, with the expert's fees paid either by the court itself or by the parties in a proportion determined by the court. The court denied the motion, finding "no good cause for appointment of an expert."[8]

Plaintiff filed a similar motion in July of 2020, after Defendants filed motions for summary judgment. He stated he had attempted to contact "dozens of experts," but "[t]he majority do not even reply," and those that do reply state "they will 'gladly' speak to an attorney [but] they will not speak to me." He thus asked the court to appoint an expert and "a limited purpose attorney to work with" the expert. The court, once again, denied the motion, finding "there is no legal authority supporting plaintiff's request for appointment of an expert . . . at the Court's or defendants' expense in a medical

---

[7] On February 15, 2017, Plaintiff filed a petition for writ of mandate in this court challenging various orders of the trial court, including the orders sustaining the demurrer, granting the motion to dismiss, denying leave to amend, and denying the motion for reconsideration. We denied the petition. (*Scaccia v. Superior Court* (C084021, petn. den. Mar. 1, 2017).)

[8] On January 7, 2019, Plaintiff filed a petition for writ of mandate challenging this order and raising various other contentions. We denied the petition. (*Scaccia v. Superior Court* (C088621, petn. den. Jan. 17, 2019).)

malpractice action," and "Plaintiff has not shown why he has failed to hire an attorney on a contingency basis since 2014."

*The 2020 Motions to Amend*

On February 28, 2020, Plaintiff filed another motion to amend, seeking, once again, to add a claim for punitive damages, and also "dropp[ing] claims that are more or less unrelated to the central wrongful death claim," including the claims for medical negligence, decisions law, and breach of confidentiality (which had originally been asserted against Dr. Kennedy and Sutter). He also sought to re-assert against Dr. Kennedy and Sutter the causes of action for false light, defamation, and fraud, and to assert against Sutter a cause of action for invasion of privacy (which had not previously been asserted against it).

On July 10, 2020, before the trial court ruled on the February 28 motion to amend, Plaintiff filed another motion to amend.

The trial court denied the first motion to amend on July 15, 2020, noting Plaintiff failed to explain why his request to amend was not made earlier, and finding the request was "way too late." The trial court noted the complaint was filed on November 12, 2014, which was almost six years ago, and "this case is up against the 5 year dismissal statute of failure to prosecute." It also noted it had dismissed with prejudice all claims against Dr. Kennedy and Sutter except the wrongful death claim in November 2015, and allowing Plaintiff to either reallege those claims or allege new ones at such a late date would be prejudicial to Defendants. The court denied the second motion to amend for the same reasons.

*The 2020 Motions for Summary Judgment*

In the meantime, in early to mid-2020, Dr. Kennedy and Sutter filed motions for summary judgment or adjudication. Both Defendants argued the undisputed facts showed their care and treatment of Anne was not a substantial factor in causing her death. Defendants' motions were supported by a declaration from an expert who opined that the

9

care rendered by Dr. Kennedy and the staff at Sutter was not a substantial factor in causing Anne's death, and that Plaintiff proffered no expert declaration in opposition to the motions.

The trial court issued a tentative ruling denying Dr. Kennedy's motion, which was scheduled to be heard first, because it had previously denied his 2016 motion for summary judgment, and section 437c, subdivision (f)(2), provides, "A party shall not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court unless that party establishes . . . newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion." At the hearing on the motion, the court vacated its tentative ruling and allowed the parties to file supplemental briefs addressing the applicability of this provision. The court ultimately ruled it was not precluded from hearing the second motion because it addressed causation, which was a new issue not previously ruled on or raised in the first motion.

On the merits, the court granted both motions, ruling as follows: "The elements of an action for wrongful death are (1) tort (negligence or other wrongful act), (2) the resulting death, and (3) the damages, consisting of the pecuniary loss by the heirs. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 796.) . . . [Citation.] . . . [Citation.] Plaintiff must prove the defendant's conduct was a substantial factor in causing the decedent's death. (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1497-1499.) Defendant has met his burden of showing that the cause of action for wrongful death has no merit because plaintiff cannot establish the element of causation. (UMF nos. 1-14). Whether the underlying tort is 'medical malpractice,' 'fraud,' 'premeditated murder,' 'willful intent,' or 'battery,' plaintiff has failed to show defendant's conduct was a substantial factor in causing plaintiff's harm. (UMF nos. 1-14; PUMF nos. 15-96.)"

Judgment in favor of Dr. Kennedy was entered January 4, 2021, and judgment in favor of Sutter was entered on January 6, 2021. On February 16, 2021, Plaintiff appealed

10

both judgments and "<u>all underlying rulings</u> (including the denial of Pl.'s motion to amend (8-29-2016) and extend the discovery cutoff to allow rulings on motions to compel compliance with discovery orders, motions to compel further, and motions to compel)."[9]

## DISCUSSION

Plaintiff's opening brief is long and difficult to understand. The argument section contains 19 separate headings (and several subheadings). We have attempted to address all arguments/headings, and we generally discuss them in the order in which they appear in the opening brief, although we have consolidated the arguments relating to summary judgment and discovery, and thus discuss them out of order.

I

*Improper Treatment of Unrepresented Party*

Plaintiff's first argument is titled "Improper Treatment of Unrepresented Homeless Party." The argument is short, and it cites the rule that a party who represents him or herself "is to be treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys." (*Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1210.) Numerous cases agree. (See *Stover v. Bruntz* (2017) 12 Cal.App.5th 19, 31; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247; *Bistawros v. Greenberg* (1987) 189 Cal.App.3d 189, 193; *Nelson v. Gaunt* (1981) 125 Cal.App.3d 623, 638; *Deauville v. Hall* (1961) 188 Cal.App.2d 535, 547.)

Plaintiff argues this rule should be reserved for "wealthy fools," and should not be applied to parties like him who are unable to afford an attorney. We disagree. As our

---

**9** On June 2, 2021, the trial court granted John's motion for summary judgment and entered judgment in his favor, and Plaintiff filed a notice of appeal on June 25, 2021. That appeal—case No. C094344—has not been consolidated with this appeal, and it is still pending. We thus do not discuss Plaintiff's claims against John.

Supreme Court has held, "self-representation is not a ground for exceptionally lenient treatment. Except when a particular rule provides otherwise, the rules of civil procedure must apply equally to parties represented by counsel and those who forgo attorney representation. [Citation.] . . . A doctrine generally requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984-985.) "As an intermediate appellate court we are bound by decisions of our Supreme Court." (*Loshonkohl v. Kinder* (2003) 109 Cal.App.4th 510, 517.)

This rule may have consequences in this case. Plaintiff's briefs are difficult to follow and understand, and few, if any, of his contentions are supported by meaningful argument or discussion of relevant legal authorities. As the appellant, however, it is Plaintiff's responsibility "to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] In addition, citing cases without any discussion of their application to the present case results in forfeiture. [Citations.] We are not required to examine undeveloped claims or to supply arguments for the litigants. [Citations.]" (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) "[A]sserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion." (*Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689.) "A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677 (*Woods*).) " 'When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary.' [Citation.] 'Issues do not have a life of their own: if they are not raised or supported by

12

argument or citation to authority, [they are] waived.' [Citation.]" (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 600 (*Okorie*), disapproved on another ground in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012, fn. 2.) This long line of authority applies to Plaintiff, even though he is representing himself.

These rules do not exist to trip up pro. per. litigants. They exist because "it is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*); see also *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness"]; *Okorie, supra*, 14 Cal.App.5th at p. 599 ["A touchstone legal principle governing appeals is that 'the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited' "].) Thus, the burden is on Plaintiff to overcome the presumption that the judgment and all underlying orders are correct. (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.) The burden is not on us "to search the record to ascertain whether it contains support for [Plaintiff's] contentions," or to " 'furnish a legal argument as to how the trial court's rulings' " are incorrect. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.) "It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) "[I]t is not this court's function to serve as . . . backup appellate counsel." (*Mansell*, at p. 546.) Thus,

13

because Plaintiff fails to support most of his contentions with reasoned and comprehensible argument, he fails to rebut the presumption that the trial court's judgment, and all the orders leading up to the judgment, are correct.

## II

### *Denied Continuances*

Plaintiff argues the trial court abused its discretion in denying him continuances.[10] Plaintiff cites just one case to support this argument—*Monastero v. Los Angeles Transit Co.* (1955) 131 Cal.App.2d 156—but he does not discuss that case at all. "[C]iting cases without any discussion of their application to the present case results in forfeiture." (*Allen v. City of Sacramento, supra*, 234 Cal.App.4th at p. 52.) We also note that *Monastero* did not involve a request for a continuance, and thus appears irrelevant.

"The decision to grant or deny a continuance is committed to the sound discretion of the trial court. [Citation.] The trial court's exercise of that discretion will be upheld if it is based on a reasoned judgment and complies with legal principles and policies appropriate to the case before the court. [Citation.] A reviewing court may not disturb the exercise of discretion by a trial court in the absence of a clear abuse thereof appearing in the record. [Citation.] The burden rests on the complaining party to demonstrate from the record that such an abuse has occurred." (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984-985.)

Plaintiff does not actually identify or discuss any particular request for a continuance that the court denied. For example, he states "incongruously, the judge denied continuances," and he supports this statement by citing "1 AA473:11-475:2, 511:23-512:3, 518:17, 493-502, 526-527, 831- 836, 843-848, 504-505, 603, 507-508,

---

[10] The heading for this argument is "Denied Continuances and Refused to Recuse," but Plaintiff does not actually discuss recusal, and we thus deem abandoned any such argument. (*Okorie, supra*, 14 Cal.App.5th at p. 600.)

14

608-609, 3 AA2303-2306; Argument XVII." As another example, he states he "meritoriously sought continuances in 2020 [and] the judge emphasized denials by concurrently fast-tracking to trial (< five-months away) [and] denied with prejudice without allowing oral argument," and he supports this statement by citing "17/28 AA12466-20287," which consists of 12 volumes and over 7,800 pages of the record. Again, it is not our job to " ' " 'to cull the record for the benefit of the appellant.' " ' " (*Okorie, supra*, 14 Cal.App.5th at p. 600.) By simply stating the judge denied continuances and then citing portions of the record or cross-referencing other arguments in the opening brief, Plaintiff has failed to meet his burden of demonstrating that the trial court abused its discretion in denying any particular request for a continuance.

III

*Summary Judgment Motions*

Almost half of Plaintiff's arguments concern the trial court's grant of summary judgment in favor of Defendants. Before discussing those arguments, we first discuss the standard of review, the relevant law on wrongful death, and the evidence in support of and in opposition to the motions for summary judgment and the trial court's ruling thereon.

*A. Standard of Review*

Summary judgment motions are governed by section 437c. It provides that summary judgment is properly granted if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) A defendant moving for summary judgment can meet its burden by showing that the plaintiff cannot establish one or more elements of a cause of action. (§ 437c, subd. (p)(2).) "Once defendants meet this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253.) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the

15

underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 856.)

"We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) In performing this de novo review, we consider all the evidence submitted with the moving and opposing papers, except evidence to which objections were made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We view the evidence in the light most favorable to the plaintiff and resolve evidentiary doubts or ambiguities in their favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We accept as true both the facts shown by the plaintiff's evidence and reasonable inferences from that evidence. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 856.)

Although we review the trial court's decision de novo, we do not ignore that decision. Instead, that decision is presumed correct, and it is the appellant's burden to affirmatively establish reversible error. (*Jameson, supra*, 5 Cal.5th at pp. 608-609; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 535.)

We may affirm a ruling granting a motion for summary judgment "if it is correct on any ground, regardless of the trial court's stated reasons." (*Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13, 20.)

*B. The Law in Wrongful Death Cases*

At the time the summary judgment motions were filed, only one cause of action against Defendants remained: wrongful death. The elements of a cause of action for wrongful death are (1) a wrongful act or negligence on the part of the defendants, (2) caused the decedent's death, (3) resulting in damages to the plaintiff. (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1263.) Defendants' motion was based solely on the second element—*causation*.

16

In a wrongful death case, "the plaintiff must prove the death was 'caused by' the defendant's wrongful act or neglect, i.e., the wrongful act or neglect was a cause in fact of the death. [Citations.] To be a cause in fact, the wrongful act must be 'a substantial factor in bringing about' the death." (*Bromme v. Pavitt, supra*, 5 Cal.App.4th at pp. 1497-1498.) As relevant here, " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case.' " (*Id.* at p. 1498; see also *Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542 ["As a general rule, the testimony of an expert witness is required in every professional negligence case to establish . . . whether any negligence by the defendant caused the plaintiff's damages"].) "When the moving party produces a competent expert declaration showing there is no triable issue of fact on an essential element of the opposing party's claims, the opposing party's burden is to produce a competent expert declaration to the contrary." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761-762.) Without a competent expert declaration to the contrary, summary judgment is appropriately granted in favor of the moving party. (*Id.* at pp. 761-765.)

*C. The Motions for Summary Judgment and the Trial Court's Ruling*

As noted, Defendants' motions for summary judgment were based solely on causation. They argued Plaintiff could not establish that anything they did or failed to do caused Anne's death. Their motions were supported by (1) Anne's medical records, and (2) the declaration of their expert, Dr. Mark Sockell, a physician specializing in internal medicine and geriatrics. In Dr. Sockell's opinion, no act or omission by Dr. Kennedy or the staff at Sutter hastened or caused Anne's death. He explained the basis for his opinion as follows.

Anne was admitted to Sutter on September 27, 2013, after a CT scan showed a 12-centimeter mass in her left hepatic lobe (i.e., her liver), along with "multiple sclerotic osseous lesions indicating likely metastatic disease to the bone. Further imaging revealed

17

mediastinal adenopathy, suggesting a likely lung primary carcinoma that was widely metastatic, and possible bone metastases." Anne also displayed weakness and dysphagia (i.e., difficulty swallowing) consistent with a stroke, but a CT scan of the brain failed to find evidence of acute stroke, although it did find extensive small vessel disease and evidence of prior infarcts. Anne was discharged home on September 30. In Dr. Sockell's opinion, Anne was "end stage and had untreatable conditions" at this time. He described her as "a frail elderly woman with multiple medical comorbidities [who] had evidence of widely metastatic cancer, a large liver tumor, mediastinal adenopathy, and probable bone metastases." He states, "Dr. Kennedy correctly assessed her life expectancy as 'severely limited.' Given her age, severe [chronic obstructive pulmonary disease] and widely metastatic cancer, there was, at this time, no effective curative or palliative treatment."

Anne was brought back to Sutter on November 10, 2013, with increasing shortness of breath. Dr. John Hernried, who performed a history and physical, described Anne as an 81-year-old woman with multiple medical problems, including end-stage chronic obstructive pulmonary disease, weakness, dyspnea (i.e., shortness of breath), "hypernatremia (from free water depletion)," and congestive heart failure. She was transferred to the intensive care unit two days later because of respiratory failure, and was intubated and placed on a ventilator. She was "critically ill," and was assessed with severe sepsis with multiorgan dysfunction (an "overwhelming infection"), likely aspiration pneumonia, and neurological, respiratory, and hematologic failure. Stool studies confirmed an infection. After treating her with antibiotics, steroids, and deep suctioning, Dr. Kennedy tried to wean Anne off the ventilator on multiple occasions between November 17 and November 22, but was unable to do so because she suffered tachycardia and agonal breathing. She was extubated on November 23, and died shortly thereafter. According to Dr. Sockell, when Anne was readmitted to Sutter in November, her "condition was end stage." She was appropriately treated with intubation, antibiotics, fluids, and steroids, and died despite the best efforts of Dr. Kennedy and the care team

18

involved. In Dr. Sockell's opinion, even if Anne had been left on a ventilator, "more likely than not, she would have died from her multiple comorbidities," including "multiple organ system dysfunction, probable metastatic cancer, and multiple infections." He also opined that "[i]n no way" did any act or omission on the part of Dr. Kennedy or the Sutter care team cause or hasten Anne's death.

Plaintiff did not have his own expert to rebut or dispute Dr. Sockell's opinion. Instead, he attacked the evidence Defendants submitted in support of their motions. In particular, he objected to Anne's medical records on the following grounds: "Suppression of evidence, incomplete, hearsay, misrepresentation, insufficient record for medical expert to derive . . . inferences. Incompetent fraudulent records; no primary records; no evidence to give credibility to the hearsay." He also objected to almost the entirety of Dr. Sockell's declaration on numerous grounds, and he attempted to dispute Dr. Sockell's opinion with his own 43-page declaration and numerous exhibits. In his declaration, Plaintiff discussed Anne's medical records and explained what he believed they showed based on his own Internet research. To give one example, Plaintiff appears to believe that Defendants deliberately overdosed Anne with morphine, first to induce a coma in order to fool Plaintiff into believing Anne was dying, and then to kill her when the ventilator was removed. Plaintiff's belief is based on information he gleaned from various Web sites about the drugs Anne was taking, combined with his own explanation of what he believes her medical records show. Plaintiff also appears to believe that Anne did not actually have cancer.

In his reply, Dr. Kennedy objected to Plaintiff's declaration in its entirety, and to almost all of the exhibits he submitted with his opposition.

The trial court overruled Plaintiff's objections to Dr. Sockell's declaration and Anne's medical records; overruled Dr. Kennedy's objections to Plaintiff's declaration; and sustained some of Dr. Kennedy's objections to Plaintiff's evidence and overruled others. It granted Defendants' motions for summary judgment, finding they met their

19

burden of showing that Plaintiff could not establish their conduct was a substantial factor in causing Anne's death, and that Plaintiff failed to produce any admissible evidence showing the existence of a triable issue of fact on causation.

### D. Analysis

#### 1. Disputed UMF's

Plaintiff's Argument III is headed "Disputed UMFs," which refers to "undisputed material facts." A party moving for summary judgment must file "a separate statement setting forth plainly and concisely all material facts that the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence." (§ 437c, subd. (b)(1).) The party opposing summary judgment must file their own "separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating if the opposing party agrees or disagrees that those facts are undisputed. . . . Each material fact contended by the opposing party to be disputed shall be followed by a reference to the opposing evidence." (*Id*., subd. (b)(3).) The facts identified in the separate statement are generally referred to as undisputed material facts or UMFs. The purpose of the separate statement is to " 'permit trial courts to expeditiously review complex motions for . . . summary judgment to determine quickly and efficiently whether material facts are undisputed.' [Citation.] The separate statement 'provides a convenient and expeditious vehicle permitting the trial court to hone in on the truly disputed facts.' " (*Nazir v. United Airlines Inc., supra*, 178 Cal.App.4th at pp. 251-252.) If a triable issue is raised as to any of the facts in the separate statement, the motion for summary judgment must generally be denied. (*Id*. at p. 252.)

It appears that Plaintiff contends some of the facts in Defendants' separate statements are, in fact, disputed, which would preclude summary judgment. Plaintiff, however, does not identify any facts that he contends are disputed. Indeed, he does not discuss Defendants' separate statements at all, and thus gives us no reason to find that

20

any of the material facts proffered by Defendants are, in fact, disputed. Here, in its entirety, is Plaintiff's argument regarding "Disputed UMFs."

> "Courts must consider all 'inferences reasonably deducible from the evidence' and construe Plaintiff's papers liberally. (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201-1202; CCP § 437c(c))
>
> "Plaintiff's undisputed material facts (19 AA13442-13485; errata [20 AA14342-14370, 14462-14484; 24 AA16874-16878]) were facts-inferences (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 647 ['not…derived from speculation' etc.]) with Kennedy's objections overruled (23 AA16845-16846; 28 AA20372:10-11) excepting bald errors sustaining some evidentiary objections and overruling Plaintiff's objections (Arguments IV-IX, XIII)
>
> "The judge failed to consider court-ordered supplemental briefing supporting Plaintiff. (E.g., Arguments IV.H, XVI.C)"

This is wholly insufficient to either (1) demonstrate that any of Defendants' proffered facts are actually disputed, or (2) overcome the presumption that the judgment is correct.

### 2. *Challenge to Evidence Submitted with Defendants' Motions for Summary Judgment*

Plaintiff contends that Defendants' motions were "based on inadmissible hearsay and incompetent expert testimony." This is by far the longest section of his brief, and again, is difficult to understand. The gist, however, appears to be that Plaintiff contends (1) Anne's medical records were inadmissible, (2) Dr. Sockell thus improperly relied on her medical records when forming his opinion on causation, and (3) Dr. Sockell's opinion is otherwise incompetent.[11] We disagree.

---

[11] This section of his brief also contains several tangential arguments that have nothing to do with the admissibility of Anne's medical records or Dr. Sockell's competence to

21

Plaintiff argues Anne's medical records are inadmissible hearsay and thus could not be relied on by Dr. Sockell in forming his opinion. We disagree with both contentions. "Although hospital and medical records are hearsay, they can be admitted under the business records exception to the hearsay rule" codified in Evidence Code section 1271 if they are properly authenticated. (*Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742.) Here, the relevant portion of Anne's medical records were attached to the appendix of evidence submitted by Defendants in support of their motions, along with an affidavit from Sutter's custodian of records establishing they are business records. Nowhere in his opening brief does Plaintiff contend the medical records were not properly authenticated (and we would reject any such contention in any event). Moreover, properly authenticated medical records "can be used as a basis for an expert medical opinion," (*id.* at p. 743), and "are the type of records on which medical experts may and do rely in order to give expert testimony in a medical malpractice case," (*Wicks v. Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 876).

Plaintiff also appears to contend that Anne's medical records are "fraudulent," and that they thus cannot support any of Defendants' proffered facts, and therefore render Dr. Sockell's opinion incompetent. He spends almost 30 pages in his opening brief discussing what he alleges are "fraudulent" hospital records containing "fraudulent" diagnoses that "masked" the actual cause of Anne's death. Plaintiff claims that the results of tests, i.e., CT scans and x-rays, were improperly interpreted, which amounted to fraudulent medical documentation. He also disputes that Anne consented to treatment, and he therefore concludes she could not consent to nontreatment, apparently asking us to

---

offer an opinion on causation, for example, the discussion of consent law and Defendants' alleged financial motivations. We need not, and do not, respond to " 'lurking' " or tangential arguments not clearly presented under a heading. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10.)

22

find that the medical records documenting Anne's consent for either (treatment or nontreatment) are thus fraudulent. Plaintiff points to nothing in the record to demonstrate Anne's medical records are fraudulent.

Plaintiff also contends Dr. Sockell's declaration is too conclusory to support his opinion. He cites *McAlpine v. Norman* (2020) 51 Cal.App.5th 933 for the proposition that a defendant moving for summary judgment cannot meet its burden " 'by an expert declaration consisting of ultimate facts and conclusions that are unsupported by factual detail and reasoned explanation, even if it is admitted and unopposed.' [Citation.] ' " ' "[B]ecause an expert opinion is worth no more than the reasons and facts on which it is based," ' " ' " an expert opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value." (*Id.* at p. 939.) Where Defendants support their motion for summary judgment with "the bare conclusion of [their] expert, unsupported by reasons or explanations," they "[do] not meet their initial burden of production, [and] they [are] not entitled to summary judgment, regardless of the adequacy of the plaintiff's opposition." (*Id.* at p. 940.) With no discussion, Plaintiff asserts Dr. Sockell's declaration is "analogous" to the declaration found insufficient in *McAlpine* to support a motion for summary judgment. Particularly with no discussion from Plaintiff on this issue, we find Dr. Sockell's declaration contains sufficient factual detail and reasoned explanation to support his conclusion that Defendants did not cause Anne's death.

Plaintiff appears to contend Dr. Sockell is not qualified to offer an opinion on causation. He states he "objected to Sockell's qualifications (e.g., 19 AA13406:15-13407:2)," but he does not tell us on what basis he objected. The cited portion of the record contains Plaintiff's objection to Dr. Sockell's statement that "I have treated many patients with similar health conditions for which Anne Ringkamp was treated for during the time period in question." Plaintiff objected to this statement on the grounds that it

23

lacks foundation, constitutes an inadmissible opinion, and is conclusory. The trial court overruled this objection, and Plaintiff fails to convince us this ruling was erroneous.

### 3. Failure to Disprove Plaintiff's Case

Plaintiff contends he did not need an expert to rebut Dr. Sockell's opinion on causation, and that causation is a disputed issue of fact that must be decided by a jury.

As noted above, an expert is generally required to establish causation in a personal injury case. "Where the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation." (*Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569; see also *Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 644-645 [expert required in professional negligence cases except in cases where negligence is "obvious to laymen"].) Here we find that the complexity of causation is beyond common experience. Anne died after a two-week hospitalization during which she suffered from respiratory failure and sepsis and spent 10 days on a ventilator. At the time, she was 81 years old, in poor health, and had multiple medical problems. We cannot say that the cause of her death is so simple or obvious that a lay person could understand it without the help of an expert.

Plaintiff also states this is a "modern res ipsa loquitur case," although he never explains what he means by this, and he discusses no applicable legal authority. He does cite three cases, two of which—*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234 and *Levin v. State of California* (1983) 146 Cal.App.3d 410—do not mention res ipsa loquitur. A third case—*Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756— barely mentions it in passing, and Plaintiff never discusses that case or explains its applicability to this case.

Res ipsa loquitur is Latin for "the thing speaks for itself." (Black's Law Dict. (5th ed. 1979) p. 1173, col.2.) " 'The doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the

one responsible.' [Citations.] [¶] Res ipsa loquitur is an evidentiary rule for 'determining whether circumstantial evidence of negligence is sufficient.' [Citation.]" (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161.) "In order to invoke res ipsa loquitur, the plaintiff has the burden to establish three conditions: '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' [Citations.] If the plaintiff establishes these conditions, the doctrine applies and the defendant is presumptively negligent." (*Id.* at pp. 1161-1162.) Presumably, Plaintiff contends the doctrine applies in this case and raises a presumption that Defendants were negligent, and their negligence caused Anne's death. We disagree, because it cannot be said that the death of an 81-year-old woman with multiple medical problems " 'ordinarily [would] . . . not occur in the absence of someone's negligence.' " (*Id.* at p. 1161.)

We thus agree that expert testimony was required in this case in order to establish causation, and that Plaintiff's failure to proffer an expert on causation is fatal to his claim.

### 4. *"Technicalities Allow Judicial Abuse"*

Plaintiff contends that, in ruling on the motions for summary judgment, the trial court erred by relying on "technicalities." He cites section 437c, subdivision (h), which provides that a summary judgment motion should be continued when it is shown that further discovery is necessary. He seemingly goes on to complain about the trial court both continuing the hearing on the motion, and not continuing the hearing. However, he never specifically identifies any particular motion he made or opposed, and the correlating ruling. Plaintiff then proceeds to discuss what he calls "*Lackner* exceptions," "*Bushling* traps," and "*Beroiz* traps," which refer to three cases: *Lackner v. North* (2006) 135 Cal.App.4th 1188, *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493,

25

and *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485. All of these cases address, in part, the procedural requirements of motions for summary judgment.

*Lackner* concerned section 437c's requirement that a motion for summary judgment must be served "at least 75 days before the time appointed for hearing." (§ 437c, subd. (a)(2).) Plaintiff does not discuss *Lackner* other than to state it "*created a narrow exception to the 75-day requirement* [citation] by assuming a shortened notice is not prejudicial if a party responds and objects without explaining the prejudice. [¶] Extending the rule beyond the specifics of that case harms unrepresented parties prone to believe prejudice is obvious." (Italics added.) Plaintiff does not explain what a *Lackner* exception is or why it should not apply in this case. More importantly, there is no need to apply an exception to the 75-day notice requirement, because, as discussed below, Defendants met the 75-day notice requirement.

*Bushling* involved a request to continue a hearing on a motion for summary judgment in order to obtain evidence necessary to oppose the motion. Plaintiff does not discuss *Bushling* or explain its applicability to this case. He also does not explain what a *Bushling* trap is. We presume, however, that Plaintiff contends the trial court improperly denied his request to continue the hearing on the summary judgment motions in order to obtain discovery of facts essential to justify his opposition. He states he "sought a good-cause continuance of Kennedy's MSJ," and then cites "17 AA 13169-13253," albeit with no discussion. The cited pages are a May 15, 2020, application filed by Plaintiff to continue the hearing on Dr. Kennedy's motion for summary judgment "because facts essential to oppose the summary judgment motion exist and [are] unavailable to plaintiff in time to oppose the motion." The application includes a declaration from Plaintiff that describes the status of various discovery requests and motions to compel involving Defendants and others (including multiple discovery issues involving John, which would appear to have no relevance to Dr. Kennedy's motion), but Plaintiff does not clearly state

26

why any of this discovery (or any other discovery) is necessary to oppose Dr. Kennedy's motion for summary judgment (which was based solely on causation).

Plaintiff also states, "an inarguably code-compliant justification of the obvious was as burdensome of responding to MSJs (20 AA14756-14922)." The cited pages are an application filed by Plaintiff on July 24, 2020, to continue the hearing on the summary judgment motions, incorporating the May 15, 2020, application. This second application is supported by a 41-page declaration from Plaintiff that is similar to the declaration in support of the first application. Plaintiff also states if the court appoints an expert on his behalf, that expert "would conclude each defendant contributed to a shortening of my mother's life through fraud, battery, neglect, and ultimately an overdose consisting of a month's supply of Ativan and 36-fold increase in morphine, but I cannot obtain an expert as noted in my motion for experts." In other words, Plaintiff does not have an expert, but if the court would appoint one for him, the expert would be able to dispute Dr. Sockell's opinion on causation. Plaintiff also stated (obliquely) that he needed to identify what documents Dr. Sockell reviewed in forming his opinions.

Plaintiff does not tell us how the trial court ruled on either application. Assuming the trial court denied the applications, Plaintiff fails to demonstrate an abuse of discretion. It appears, however, that the trial court granted one of the applications, because Dr. Kennedy's brief points us to a ruling issued on September 15, 2020, continuing the hearing on the summary judgment motions to October 27, and granting Plaintiff's motion to depose Dr. Sockell.

The final case Plaintiff cites is *Beroiz*, which involved the requirement that a motion for summary judgment "shall be heard no later than 30 days before the date of trial, unless the court for good cause orders otherwise." (§ 437c, subd. (a)(3).) Plaintiff fails to explain why or how *Beroiz* is applicable to the facts of this case because he never suggests the motions for summary judgment were held within 30 days of trial. Moreover, he ends his argument about a *Beroiz* trap by noting, "A retired judge *prevented* a *Beroiz*

27

Trap," (first italics added), which suggests that whatever trap *Beroiz* created, it was ultimately avoided in this case.

### 5. *Evidentiary Rulings*

Plaintiff's 13th argument is headed "Courts Cultivate a Plague of Science-Deniers That is Correctible with Decisional Law Reversing Evidentiary Rulings." It appears he is asking us to create a new exception to the hearsay rule, or to substantially expand an existing one, because he cites *In re Cindy L.* (1997) 17 Cal.4th 15, and in that case our Supreme Court held that, in certain very limited circumstances, appellate courts have the power to create new exceptions to the hearsay rule. (*Id.* at p. 27.) It further appears that Plaintiff wants us to make it easier to introduce "scientific and medical facts" pursuant to Evidence Code section 1341, which provides, "Historical works, books of science or art, and published maps or charts, made by persons indifferent between the parties, are not made inadmissible by the hearsay rule when offered to prove facts of general notoriety and interest." (Evid. Code, § 1341.) As examples, Plaintiff identifies facts verifiable by "multiple government and university sources," and facts "such as the metabolic decay of drugs[ and] their effects and side effects." Plaintiff, however, provides no reasoned argument or citation to authorities explaining why we should create a new exception to the hearsay rule or expand an existing one, and we thus deem the argument "abandoned and unworthy of discussion." (*Wright v. City of Los Angeles, supra*, 93 Cal.App.4th at p. 689.)

In addition to asking us to loosen rules for the admission of certain scientific and medical facts, Plaintiff also contends the trial court abused its discretion when it sustained objections to evidence he submitted in opposition to Defendants' summary judgment motions. This contention, however, is not supported by meaningful or coherent argument or citation to relevant authorities. Instead, Plaintiff simply asserts the trial court erroneously sustained objections, but fails to clearly identify the objection and the evidence to which the objection was made, or to clearly explain why the trial court erred

28

in sustaining the objection. Again, it is not our job to cull the record in search of error, it is Plaintiff's job to affirmatively demonstrate error, (*Okorie, supra*, 14 Cal.App.5th at p. 600); we are "not required to examine undeveloped claims, nor to make arguments for parties," (*Paterno v. State of California, supra*, 74 Cal.App.4th at p. 106); and "it is not this court's function to serve as . . . backup appellate counsel," (*Mansell v. Board of Administration, supra*, 30 Cal.App.4th at p. 546). By failing to provide us with reasoned argument or analysis about any particular evidentiary ruling, Plaintiff has failed to overcome the presumption that the rulings were correct.

### 6. Code Noncompliance

Plaintiff argues Defendants' motions for summary judgment were "code-noncompliant" because they violated a provision in the summary judgment statute that provides, "A party shall not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court unless that party establishes, to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion." (§ 437c, subd. (f)(2).) This "prohibition against repeated summary judgment motions was added to make the summary judgment process more efficient and to reduce the opportunities for abuses of the procedure." (*Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1096, fn. 3.)

As noted above, Defendants filed motions for summary judgment or adjudication in 2016, which the court denied. They then filed second motions for summary judgment or adjudication in 2020, which the court granted. Plaintiff contends the second motions violated the prohibition against repeat summary judgment motions because Defendants failed to establish newly discovered facts or circumstances or a change of law. The trial court permitted supplemental briefing on this issue, and ultimately ruled it was not precluded from considering the second motions because they "addresse[d] causation, a

29

new issue not previously ruled on by the Court. (*Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 71-72.)" Plaintiff challenges this ruling.

In *Nieto*, the court held the rule against repeat summary judgment motions did not bar a second motion that was based on "an issue not raised by the first motion." (*Nieto v. Blue Shield of California Life & Health Ins. Co., supra*, 181 Cal.App.4th at p. 72.) Dr. Kennedy's second motion for summary judgment was clearly based on an issue not raised by his first motion. His second motion was based solely on causation, and his first motion was based solely on the standard of care.[12] We thus agree that Dr. Kennedy's second motion was not barred by the prohibition against repeated summary judgment motions.

Sutter's motions are different, because its first motion *was* based on causation. It supported its motion by proffering the opinion of an expert who stated, "Ms. Ringkamp's death was not caused by any negligent acts or omissions in the care and treatment provided to her by Sutter Davis Hospital's nursing and paraprofessional staff. Rather, Ms. Ringkamp's complex combination of medical conditions . . . , including evidence of metastatic cancer and a large liver tumor, ultimately caused her death." Sutter's second motion, which was also based on causation, thus did not address a new issue. Ultimately, however, we are not convinced it was improper for the trial court to consider Sutter's second motion, because it denied the first motion on technical grounds having nothing to do with causation. Thus, although Sutter raised causation in both of its motions, the trial

---

[12] We recognize that the separate statement in support of Dr. Kennedy's first motion for summary judgment identified causation as a separate issue—"Issue #2: Daniel J. Kennedy, M.D.'s treatment did not cause Anne Ringkamp's demise." However, "It is elemental that a notice of motion must state in writing the 'grounds upon which it will be made.' [Citations.] Only the grounds specified in the notice of motion may be considered by the trial court." (*Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542, 1545.) Because the notice of motion stated it was based on the standard of care, that is the only issue the court could consider.

court did not deny the first motion on that ground, and Sutter's second motion was thus not "based on issues asserted in a prior motion . . . *and denied by the court*." (§ 437c, subd. (f)(2), italics added.)

*7. Insufficient Notice*

As noted above when discussing the so-called *Lackner* exception, section 437c provides a motion for summary judgment "shall be served on all other parties to the action at least 75 days before the time appointed for hearing. If the notice is served by mail, the required 75-day period of notice shall be increased by 5 days." (§ 437c, subd. (a)(2).) Plaintiff argues both motions provided insufficient notice. We disagree.

Dr. Kennedy's motion was filed March 6, 2020, and the hearing was scheduled for June 9, 2020 (which is 95 days after the motion was filed). According to the proof of service, Plaintiff was served by mail on March 13, 2020, which is 88 days prior to the hearing, and well within section 437c's requirements.

Sutter's motion was filed on May 19, 2020, and the hearing was scheduled for August 13, 2020. According to the proof of service, the motion was served on Plaintiff by e-mail on May 15, 2020, and was also served by mail on June 11, 2020. May 15 is 90 days before the August 13 hearing, while June 11 is 63 days before the hearing. Service by e-mail was thus timely, but service by mail was not.

In 2020, when this issue arose below, electronic service was authorized if a party "ha[d] agreed to accept electronic service in that specific action . . . ." (Former § 1010.6, subd. (a)(2)(A)(i).) Plaintiff appears to argue he did not agree to accept electronic service, that service by e-mail was thus ineffective, and that service was thus untimely. We disagree with all three arguments.

After being served by e-mail on May 15, Plaintiff filed an application in the trial court to have Sutter "serve MSJ per code." In the application, he acknowledged that he received an e-mail on May 15 stating "Sharon Brazell has shared 5 files," and clearly identifying the files as Sutter's summary judgment papers; the e-mail was from

31

"delivery@spaces.Hightailmail.com." Brazell also sent him an e-mail that same day stating: "You should have received an email from me via Hightail attaching Sutter's motion for summary judgment, or in the alternative, summary adjudication, together with supporting documents. [¶] If you do not have a Hightail account, you will need to go to www.hightail.com and create a free account.[13] Once you do that, you will be able to download the above-referenced documents. Please let me know if you have any questions." Plaintiff states when he tried to download the files, he was routed to a Web site to create an account to obtain the documents, but he declined to do so because "it is my belief that Sutter is up to something malicious by insisting I join some third party platform. It smells bad to me." In his application, Plaintiff stated he was "*willing to accept email service*, but not the way Sutter counsel wants it." (Italics added.) The trial court denied Plaintiff's application, finding he had consented to service by e-mail.

As noted above, the Code of Civil Procedure permits electronic service if a party agrees thereto. In his application to the trial court, Plaintiff essentially acknowledged he agreed to accept electronic service. Electronic service means service of a document "by *either* electronic transmission *or* electronic notification." (§ 1010.6, subd. (a)(1)(A), italics added.) Electronic transmission means "the transmission of a document by electronic means to the electronic service address at through which a party . . . has authorized electronic service." (Former § 1010.6, subd. (a)(1)(B).) Electronic notification means "the notification of the party . . . that a document is served by sending an electronic message to the electronic address at or through which the party . . . has authorized electronic service, specifying the exact name of the document served, and providing a hyperlink at which the served document may be viewed and downloaded." (Former § 1010.6, subd. (a)(1)(C).) Sutter served its motion by electronic notification

---

[13] Hightail appears to be an electronic document sharing platform.

(i.e., it sent Plaintiff an e-mail that provided a hyperlink at which the documents could be viewed and downloaded). Sutter's motion was thus properly, and timely, served.

### 8. Spoliation

Plaintiff's fifth argument is titled "Spoliation Prevented Burden Shifting." Spoliation refers to the intentional destruction or suppression of evidence. (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 4.) "[T]here are a number of . . . remedies that seek to punish and deter the intentional spoliation of evidence," including "the evidentiary inference that evidence which one party has destroyed or rendered unavailable was unfavorable to that party." (*Id*. at p. 11.) This inference is codified in Evidence Code section 413, which provides, "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case." (Evid. Code, § 413.) Plaintiff cites *Cedars-Sinai Medical Center* and Evidence Code section 413, but does not discuss them. Again, "citing cases [or statutes] without any discussion of their application to the present case results in forfeiture." (*Allen v. City of Sacramento, supra*, 234 Cal.App.4th at p. 52.)

Plaintiff contends that Defendants intentionally destroyed or suppressed evidence, and that it is thus appropriate to infer that this evidence would be unfavorable to them. To support his contention, he lists over 250 pages of records that Defendants "effectively spoliated." He fails to explain, however, how these records were either destroyed or suppressed. Moreover, rather than making cogent arguments about either spoliation or the records he cites, he simply refers us to other sections of his brief, including sections VIII.B(1); VIII.B(2); VIII.C.(1)(a)(2); VIII.C(2)(a)1-VIII.C(2)(a)5; VIII.C(2)(b); VIII.C(2)(c)1; VIII.C(3)-VIII.C(6)(b); IV.D(2); IV.F(1); IV.F(2); IV.F(3); and IV.F(11)(b). This is inadequate to sustain his burden of overcoming the presumption that the trial court's judgment and orders are correct. Again, "it is not this court's role to

construct theories or arguments that would undermine the judgment and defeat the presumption of correctness.  Rather, an appellant is required to present a cognizable legal argument in support of reversal of the judgment.  'When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary.'  [Citation.]  'Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, [they are] waived.'  [Citation.]  Further, an appellant is required to explain the relevance of facts cited in his or her brief.  This court is not ' " 'obligate[d] . . . to cull the record for the benefit of the appellant.' " '  [Citation]."  (*Okorie, supra*, 14 Cal.App.5th at p. 600.)  Because Plaintiff proffers no cognizable legal argument to support his argument about spoliation, we deem the issue waived and do not discuss it further.

IV

*Discovery*

Plaintiff makes three arguments about discovery.  The first argument is titled "Reopen Discovery and Reverse Rulings," and it concerns discovery rulings.  "The trial court's ruling on a motion to compel discovery is reviewed for abuse of discretion."  (*Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 266.)  As the appellant, it is Plaintiff's burden to affirmatively demonstrate the trial court abused its discretion.  (See *Rutledge v. Hewlett-Packard Co.* (2015) 238 Cal.App.4th 1164, 1191.)  He fails to meet his burden.

Plaintiff begins his argument by stating that space limitations forced him to "summariz[e] problems," and he refers us to "the underlying papers (including continuances and objections) for full factual and legal justifications."  This is both improper and inadequate to meet his burden of demonstrating the trial court abused its discretion.  Again, "parties are required to include argument and citation to authority *in their briefs*, and the absence of these necessary elements allows this court to treat . . . [the] issue as waived."  (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445,

34

1448, italics added.) Plaintiff cannot simply direct us to the underlying papers and hope we will find legal error.

The last section of this argument is subheaded "responses requiring review." From that subheading, it appears Plaintiff wants us to "review" the following discovery responses: Sutter's responses to (1) six requests for production of documents (sets 2 through 7), (2) eight special interrogatories (sets 2 through 9), and (3) two requests for admissions (sets 2 & 4); and Kennedy's responses to (1) three requests for production of documents (sets 1, 2 and 4), (2) five special interrogatories (sets 1, 2, 3, 4 & 7), and (3) two requests for admissions (sets 4 & 5). All told, Plaintiff has identified 26 sets of discovery responses that somehow require our review.

Here, in its entirety, is Plaintiff's argument concerning two of those responses:

> "Judge refused to hear motions (RFP6-RFP7) . . . [¶] . . . concerning admission forms, hidden-spoliated/electronic records and defenses; Sutter never responded to RFP6; Sutter produced nothing supporting affirmative defenses (Section A(6); 25 AA18067-18118; 27, AA19851-19919, 19255-19841 [esp. 19328:10-19330:23]; 28 AA20286-20287, 20366-20367; Argument II.C)"

The cited portions of the record total over 700 pages. Plaintiff's one-sentence argument, followed by a citation to hundreds of pages of records, is insufficient to demonstrate the trial court abused its discretion in denying any motion to compel. By simply directing us to the underlying papers, Plaintiff has forfeited any argument about the trial court's discovery rulings. (See *Okorie, supra*, 14 Cal.App.5th at pp. 599-600.) His arguments concerning the other 24 responses suffer from the same problem. Plaintiff thus fails to demonstrate the trial court abused its discretion when ruling on any discovery motions.

Plaintiff's second argument about discovery concerns Evidence Code section 1157, which "protects from discovery reports and other documents of any medical staff committee assigned the task of evaluating a doctor's performance. . . . 'Section 1157 was

35

enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. It evinces a legislative judgment that the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality.' " (*West Covina Hospital v. Superior Court* (1984) 153 Cal.App.3d 134, 136.)

The heading of this section of Plaintiff's brief is "Evidence Code Section 1157 Privilege Masked Treatment-Administrative Decisions To Thwart Discovery." It thus appears that Plaintiff contends Defendants cited Evidence Code section 1157 to justify their refusal to produce certain documents in response to discovery, but that the documents are not, in fact, protected from discovery. Again, however, Plaintiff fails to support his argument in any meaningful way. For example, he cites Sutter's response to a request to produce "All pharmacy RECORDS concerning Anne Ringkamp produced between August 9, 2013 and January 5, 2015." Sutter responded, in full, "Defendant has produced all relevant records in its possession, custody or control." This response does not cite Evidence Code section 1157, much less demonstrate that Defendants inappropriately relied on that section when refusing to produce certain documents.

Plaintiff also cites several pages of medical records regarding Anne, including records that note Sutter staff were attempting to deal with the "[v]ery complicated social dynamic" between Plaintiff and John, and the fact that "[b]oth John and [Plaintiff] have made claims that the other one is abusive or neglectful to pt." He also cites a "Report of Suspected Dependent Adult/Elder Abuse" made by a Sutter social worker who reported that John had stated Plaintiff was financially abusing Anne. Plaintiff fails to explain how any of these records demonstrate that Defendants inappropriately refused to produce discoverable documents in reliance on Evidence Code section 1157.

Because Plaintiff fails to support any claim of error regarding Evidence Code section 1157, or explain its applicability to this case, he has forfeited any such claim, and we accordingly decline to consider it.

Plaintiff's third, and final, argument about discovery is titled "Discovery Codes (Concerning Sanctions and Responses) Unconstitutionally And Unnecessarily Skew Outcomes In Asymmetric Litigation." He appears to contend the Civil Discovery Act's (§ 2016.010 et seq.) provisions regarding sanctions are unconstitutional because they effectively deny pro. per. and economically marginalized litigants equal access to the courts.[14] His primary argument appears to concern those provisions in the Civil Discovery Act that require the court to impose monetary sanctions against any party who "unsuccessfully makes or opposes a motion to compel . . . unless it finds that the one subject to the sanctions acted with substantial justification or that other circumstances make the imposition of the sanctions unjust." (§§ 2030.300, subd. (d) [interrogatories], 2031.320, subd. (b) [requests for production of documents], 2033.290, subd. (d) [requests for admissions].) Plaintiff contends these provisions adversely impact pro. per. litigants because they do not understand the technicalities of propounding and responding to discovery, and thus inevitably end up being sanctioned for unsuccessfully making or opposing motions to compel. He recommends revising the Civil Discovery Act to provide different methods of calculating the amount of sanctions when issued for or against unrepresented parties, and he has even drafted new language to be used for this purpose. Rewriting the Civil Discovery Act, however, " 'is a job for the Legislature, not the courts; our role is to interpret statutes, not to [re]write them.' " (*Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 910.)

To the extent Plaintiff contends the Civil Discovery Act's sanction provisions are unconstitutional, he fails to support his contention with reasoned argument or citation to

---

[14] He made similar arguments in a petition for writ of mandate filed on October 8, 2019. We denied the petition. (*Scaccia v. Superior Court* (C090545, petn. den. Nov. 15, 2019).)

authorities, and we thus disregard it. (*Okorie, supra*, 14 Cal.App.5th at p. 600; *Woods, supra*, 167 Cal.App.4th at p. 677.) To the extent he complains about the unjustness of any particular order awarding sanctions against him, he fails to identify any such order.

V

*Failure to Appoint an Expert*

Plaintiff argues the trial court abused its discretion in failing to appoint an expert on his behalf. We find no abuse of discretion.

In July 2018 and again in July 2020, Plaintiff filed a motion asking the court to appoint him an expert because he could not afford one. Because the experts he contacted told him they will only work with attorneys, he also asked the court to appoint him an attorney to work with the expert. In support of both motions, he cited Evidence Code section 730, which provides, "When it appears to the court . . . that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section . . . at the amount as seems reasonable to the court." (Evid. Code, § 730.) The expert's compensation shall be paid either by the court or the county in which the court sits, or by the parties "in a proportion as the court may determine." (Evid. Code, § 731, subd. (c); see also *id.*, subd. (b).) The court denied both motions, noting "there is no legal authority supporting plaintiff's request for appointment of an expert . . . at the Court's or defendants' expense in a medical malpractice action." It also noted "Plaintiff has not shown why he failed to hire an attorney on a contingency basis since 2014."

We review a decision about whether to appoint an expert pursuant to Evidence Code section 730 for an abuse of discretion. (*In re Marriage of E.U. & J.E.* (2012)

212 Cal.App.4th 1377, 1389.) As Plaintiff correctly notes (and as we discussed above), an expert is generally required in a medical malpractice case to establish both the standard of care and causation. (*Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 943; *Bromme v. Pavitt, supra*, 5 Cal.App.4th at p. 1504.) Because Plaintiff cannot prove his case without an expert, he argues the court abused its discretion in refusing to appoint one for him. As Defendants accurately note, however, there appear to be no cases under Evidence Code section 730 where a court has appointed an expert for a plaintiff in a medical malpractice case at the expense of the court, the county, or the defendant. Plaintiff fails to convince us the trial court abused its discretion in refusing to appoint an expert.

Plaintiff also supported his motions by citing a local rule that provided, "Where a party is indigent and an expert is necessary to enable counsel to properly represent the party, counsel may apply for the appointment of an expert for the purpose of (1) assisting counsel in case preparation, and/or (2) testifying the jurisdictional, disposition, or other hearing." (Super. Ct. Yolo Court, Local Rules, former rule 21.11(a).) This rule, however, applied only in juvenile matters, and is thus not applicable in this case.

VI

*Medical Injury Compensation Reform Act of 1975*

Plaintiff contends certain provisions in the Medical Injury Compensation Reform Act of 1975 (MICRA) (Stats. 1975, 2d. Ex. Sess. 1975-1976, chs. 1, 2, pp. 3949-4007) are unconstitutional, as least as applied to "economically marginalized parties" like him.[15] He fails to convince.

---

[15] He raised similar arguments in a petition for writ of mandate filed on March 2, 2018. We denied the petition. (*Scaccia v. Superior Court* (C086598, petn. den. Mar. 15, 2018).)

The Legislature enacted MICRA in 1975[16] in response to " 'serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums.' " (*Chan v. Curran* (2015) 237 Cal.App.4th 601, 607 (*Chan*).) "[T]he Legislature found that the high cost of medical malpractice insurance premiums was (1) threatening to curtail the availability of medical care in the state and (2) creating a situation in which patients, injured by medical malpractice, might well find that there was no liability insurance to cover the damages they had sustained. To meet those problems, the Legislature enacted a series of measures aimed at reducing medical malpractice insurance costs." (*Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 930 (*Roa*).) These measures were designed to reduce the costs associated with malpractice litigation by " 'revising a number of legal rules applicable to such litigation' " and "limiting the amount and timing of recovery" in such cases. (*Chan*, at p. 607.)

MICRA applies to professional negligence actions against health care providers. Among other things, it: (1) caps the amount of noneconomic damages that are recoverable (Civ. Code, § 3333.2); (2) caps contingency fees (Bus. & Prof. Code, § 6146); (3) establishes a relatively short statute of limitations (Code Civ. Proc, § 340.5); (4) establishes procedures for the trial court to determine whether punitive damages may be alleged (Code Civ. Proc, § 425.13); and (5) requires the court to order that future damages be paid periodically rather than in a lump sum in certain circumstances (Code Civ. Proc., § 667.7). Plaintiff contends these provisions are unconstitutional.

---

[16] Defendant has filed a request that we take judicial notice of recent amendments to MICRA (Assem. Bill No. 35 (2021-2022 Reg. Sess.)) and portions of its legislative history. Finding the legislative amendment and history irrelevant to our analysis or decision, we decline to do so and hereby deny his request for judicial notice.

Defendants argue we should not reach Plaintiff's arguments about MICRA because most of the provisions he challenges were never actually applied to him. For example, he was not awarded damages, and was thus not affected by the provisions in MICRA, capping or limiting damages. However, one of Plaintiff's primary arguments is that MICRA's caps and limits on damages and continency fees combine to dissuade attorneys from taking medical malpractice cases on a contingency fee basis because the potential recovery is too low to make such cases worth their time, which effectively forces economically marginalized parties, like him, to proceed pro. per. and impinges on their right to retain competent counsel. So understood, we find Plaintiff sufficiently aggrieved to raise this issue on appeal, and choose to address it. (See *Roa, supra*, 37 Cal.3d at p. 925, fn. 4 [finding the plaintiffs had standing to challenge MICRA's cap on contingency fees even though enforcement of cap preserved more money for them, because they argued cap disincentivized attorneys from pursuing additional recovery, and concluding the "plaintiffs should not be deprived of the opportunity to pursue this substantive argument on appeal by a threshold determination that they not 'aggrieved' as a matter of law"].)

Most of MICRA's provisions have survived repeated legal challenges, and Plaintiff presents no reasoned argument why we should depart from this long line of authority.

For example, MICRA capped noneconomic damages at $250,000 for almost 50 years, with no adjustment for inflation.[17] The cap was upheld by our Supreme Court in *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 164, and it has been upheld numerous times since then. (See *Chan, supra*, 237 Cal.App.4th at pp. 605-607 [collecting cases].) Plaintiff cites the dissenting opinion in *Fein* to support his argument

---

[17] Effective January 1, 2023, the Legislature amended MICRA to substantially increase the cap and to adjust it for inflation.

41

that the cap is unconstitutional, "but dissenting opinions are not binding precedent." (*People v. Lopez* (2012) 55 Cal.4th 569, 585.)

Plaintiff cites the proposition that "the constitutionality of a statute is not determined once and for all by a decision upholding it. A change in conditions may invalidate a statute which was reasonable and valid when enacted." (*Perez v. Sharp* (1948) 32 Cal.2d 711, 737 (conc. opn. of Carter, J.).) Plaintiff argues the insurance premium crisis that led to MICRA's enactment no longer exists, and it is thus appropriate for us to reconsider the constitutionality of the cap on noneconomic damages due to changed circumstances. In *Chan, supra*, 237 Cal.App.4th 601, the court considered the same argument, and rejected it, holding both that it was the exceedingly rare case that justified striking down a law that had previously been upheld, and that the plaintiff failed to demonstrate circumstances had totally changed since MICRA's enactment. (*Chan*, at pp. 613-621.) Plaintiff gives us no reason to depart from *Chan*'s thorough and well-reasoned consideration of this issue.

Finally, Plaintiff notes that other states' courts have struck down caps on noneconomic damages similar to MICRA's cap on the ground that they deprive plaintiffs of the right to a trial by jury. (See, e.g., *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt* (Ga. 2010) 691 S.E.2d 218, 221-224; *Watts ex rel. Watts v. Lester E. Cox Med. Ctrs.* (Mo. 2012) 376 S.W.3d 633, 640; see also *Siebert v. Okun* (N.M. 2021) 485 P.3d 1265, 1277, fn. 3 [collecting cases].) This may be true, but it is irrelevant, because our Supreme Court has upheld MICRA's cap on noneconomic damages, and we are bound by its decisions, not the decisions of other states' courts. (*Loshonkohl v. Kinder, supra*, 109 Cal.App.4th at p. 517.)

Plaintiff's challenges to other provisions in MICRA fail for similar reasons.

MICRA's cap on contingency fees was upheld by our Supreme Court in *Roa*, *supra*, 37 Cal.3d at p. 923.[18] Plaintiff never discusses *Roa*, much less explains how or why we have authority to disregard it. To the extent he makes another changed circumstances argument, we reject it for the reasons stated in *Chan, supra*, 237 Cal.App.4th 601.

MICRA's statute of limitations is "three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." (§ 340.5.) The provision has been upheld against constitutional challenge, (see *Kite v. Campbell* (1983) 142 Cal.App.3d 793, 800-801), and, in any event, none of Plaintiff's claims were barred by MICRA's statute of limitations, and he thus lacks standing to challenge it.

MICRA provides a claim for punitive damages may not be included in a medical malpractice complaint unless and until the plaintiff files a motion seeking to add such a claim, and supports the motion with affidavits that establish "a substantial probability that the plaintiff will prevail on the claim." (§ 425.13, subd. (a).) The motion must be filed "within two years after the complaint . . . is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier." (*Ibid*.) This provision was upheld against a right to jury trial challenge in *Aquino v. Superior Court* (1993) 21 Cal.App.4th 847. Plaintiff cites no legal authority to support his argument that this provision unconstitutionally discriminates against the economically marginalized, and we thus reject it. (*Woods, supra*, 167 Cal.App.4th at p. 677 ["A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking"].)

---

[18] This cap was also increased effective January 1, 2023.

Finally, MICRA provides that, on the request of either party and in certain circumstances, the court shall order that future damages be paid by periodic payments rather than in a lump sum. (§ 667.7, subd. (a).) This provision has been upheld against equal protection, due process and right to jury trial challenges. (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359.) Again, Plaintiff cites no legal authority to support his argument that this provision is unconstitutional, and we thus reject it. (*Woods, supra*, 167 Cal.App.4th at p. 677.)

VII

*Leave to Amend*

Plaintiff complains the trial court improperly denied his numerous requests to file an amended complaint.[19] Based on our review of the index of the appellant's appendix, it appears Plaintiff filed no fewer than 10 motions to amend or motions for reconsideration of orders denying leave to amend. The court denied most of these motions (although it did grant his request "to amend defendants' names and for no other purpose"). Plaintiff contends that the trial court "improperly denied amendments," but he does not clearly identify which rulings or orders he challenges on appeal, and, as noted numerous times, it is not our job to serve as Plaintiff's backup counsel or cull through the record to find support for undeveloped arguments. (*Okorie, supra*, 14 Cal.App.5th at p. 600.)

---

[19] We note that Plaintiff does not challenge the trial court's order sustaining Defendants' demurrers to all claims except the wrongful death claim with leave to amend, and he does not challenge the trial court's order dismissing those claims because he failed to file an amended complaint within the time allowed. Although he mentions in passing that some claims were "properly pled" or "erroneously dismissed on demurrer," we need not, and do not, address " 'lurking' " arguments that are not clearly presented under a heading. (*Imagistics Internat., Inc. v. Department of General Services, supra*, 150 Cal.App.4th at p. 593, fn. 10; see also *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 ["The failure to head an argument as required by California Rules of Court, rule 15(a), constitutes a waiver"].)

In his brief, Plaintiff specifically identifies only *one* motion to amend—the one filed on August 29, 2016. The trial court denied the motion by order dated November 28, 2016,[20] noting, "1. On April 29, 2015, and August 13, 2015, this Court issued Orders sustaining [Defendants' demurrers], both with leave to amend. [¶] 2. Notwithstanding the Court's Orders, Plaintiff did not seek to file an Amended Complaint until over one year later . . . . [¶] 3. Plaintiff was given over a year's time to file an amended complaint. [¶] 4. In the absence of new facts or new law, the Court finds that Plaintiff's delay to file an amended complaint is inexcusable."

Section 473 provides, "The court may, in furtherance of justice, and on any terms as may be proper, . . . in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading . . . ." (§ 473, subd. (a)(1).) "Motions for leave to amend are directed to the sound discretion of the judge . . . . [Citation.] However, the court's discretion will usually be exercised liberally to permit amendment of the pleadings. [Citations.] The policy favoring amendment is so strong that it is a rare case in which denial of leave to amend can be justified." (*Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1428.) A trial court's decision denying leave to amend is reviewed for an abuse of discretion, and it is Plaintiff's burden to demonstrate abuse. (*Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612.) Although it is Plaintiff's burden to demonstrate the trial court abused its discretion in denying leave to amend, he offers no argument on the issue. Instead, he simply states he sought leave to amend, and the court denied the amendment as untimely despite finding no prejudice to Defendants. Despite the strong policy

---

[20] The trial court initially issued a tentative ruling *granting* the motion because "Defendants have not adequately demonstrated that they will suffer any prejudice from amendment. (*Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564-65.)" At the hearing on the demurrer, however, the trial court vacated the tentative ruling, and denied the motion because "Plaintiff was given time to amend complaint but didn't until 9-16-16."

favoring amendment, " 'The law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment. [Citation.]' [Citation.] 'The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " (*Id*. at p. 613.) With no reasoned argument from Plaintiff on the issue, he fails to rebut the presumption that the trial court's order is correct. (*Jameson, supra*, 5 Cal.5th at pp. 608-609.)

In addition to identifying the August 29, 2016, motion for leave to amend, Plaintiff also notes, "In 2020, the judge denied various amendments including clarifications to facts-claims by citing the 2016 denial with prejudice and erroneously claiming technical flaws (16 AA 12090-12718, 20 AA 14663-14669, 14444-14447, 14449-14586, 22 AA 15681-15684; 23 AA 16849)." That is the sum total of Plaintiff's arguments about "various" other denied motions to amend.[21] The cited portions of the record include (1) a motion to amend filed February 28, 2020, and the order denying that motion (along with a tentative ruling denying the motion and a minute order taking the motion under submission), and (2) a motion to amend filed July 10, 2020, and the order denying that motion. Plaintiff does not discuss either the contents of the motions or the court's orders denying the motion, and thus fails to affirmatively demonstrate the trial court abused its discretion in denying leave to amend. (*Jameson, supra*, 5 Cal.5th at pp. 608-609.)

---

[21] He also cites, albeit with no discussion, a motion he filed on October 26, 2020, seeking leave to amend to add his brother Alan as a nominal defendant. Plaintiff does not explain how his request to add his brother as a defendant is relevant to this appeal, which concerns the judgment entered in favor of Defendants Dr. Kennedy and Sutter.

# VIII

## *Monetary Sanctions*

Plaintiff asks us to "Reverse Monetary Sanctions." He states the court "sanctioned the homeless Plaintiff $2,780," and he believes this sanction was "unjust," but he gives us no information about why he was sanctioned or the circumstances surrounding the sanction. He also states he was "unjustly taxed costs," and "[c]osts for the 'successful' MSJs should be reversed," but he provides us with no other information about these costs, and no citation to authorities. With no "reasoned, substantial argument and citation to supporting authorities" on this issue, we need not consider it. (*Woods, supra*, 167 Cal.App.4th at p. 677.)

# IX

## *Venue*

Plaintiff's final argument is this: "After six judges, a new venue is appropriate. Abusive discovery tactics/judging, refusals to grant continuances and rule on discovery (e.g., 9 AA7783-7879) unjustly ran the clock (CCP § 583.310) requiring guidance to prevent Plaintiff from miscalculating remaining time (16 AA12461-12463)." We reject this argument because it is "perfunctorily asserted without legal development." (*Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1282.)

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

                                                    /s/
                                               EARL, J.

We concur:

     /s/
ROBIE, Acting P. J.

     /s/
DUARTE, J.